## COMMONWEALTH vs. BARRY LEVIN
## (and nineteen companion cases[1]).

Norfolk.    November 6, 1980. — February 27, 1981.

Present: ARMSTRONG, DREBEN, & NOLAN, JJ.

*Forgery. False Pretenses. Larceny. Uttering Forged Instrument. Evidence,* Other offense, Relevancy and materiality, Opinion. *Practice, Criminal,* Venue, Severance.

At the trial of four defendants on charges arising out of their procurement of an insurance policy on the life of the president of a company in which two of the defendants had substantial financial interests, there was sufficient evidence to warrant findings that one of the defendants, an insurance broker, had forged the insured's signature on the policy application, that another defendant, a physician, had made out a false medical report in connection with the application, and that these acts were done with the knowledge and approval of a third defendant, an attorney. [493-495] NOLAN, J., dissenting with respect to the sufficiency of the evidence against the attorney.

At the trial of four defendants on charges arising out of their procurement of an insurance policy on the life of the president of a company in which two of the defendants had substantial financial interests, there was sufficient evidence to warrant findings that the insurance broker who had forged the insured's signature on the policy application, the physician who had made out a false medical report in connection with the application, and the attorney with whose knowledge and approval those acts were done had obtained by false pretenses the signatures of officers of the insurance company when the company issued the policy on the forged application and medical examination. [495] NOLAN, J., dissenting with respect to the sufficiency of the evidence against the attorney.

At the trial of an insurance broker, a physician, an attorney, and a businessman on charges arising out of their procurement of an insurance policy on the life of the president of a company in which the attorney and the businessman had substantial financial interests, there was suf-

---

[1] Four of the companion cases are against Barry Levin, four are against Irwin Jacobson, six are against Robert Effenson and five are against Earle Groper.

ficient evidence to warrant findings that the broker who had forged the insured's signature on the policy application, the physician who had made out a false medical report in connection with the application, and the attorney with whose knowledge and approval those acts were done had committed larceny by false pretense in obtaining the policy, although there was insufficient evidence that the businessman had knowledge of the forgeries at the time of the policy application to warrant a finding that he had committed larceny. [495-496] NOLAN, J., dissenting with respect to the sufficiency of the evidence against the attorney, and ARMSTRONG, J., dissenting with respect to the insufficiency of the evidence against the businessman.

At the trial of an insurance broker, a physician, an attorney, and a businessman on charges arising out of their procurement of an insurance policy on the life of the president of a company in which the attorney and the businessman had substantial financial interests, there was sufficient evidence to warrant findings that the attorney and the businessman, after the insured's death, had offered the policy as genuine knowing the insured's signature to be false, although there was insufficient evidence to warrant such a finding against the broker. [496-498] NOLAN, J., dissenting with respect to the sufficiency of the evidence against the attorney and the businessman.

At the trial of four defendants on charges arising out of their procurement of an insurance policy on the life of the president of a company in which two of the defendants had substantial financial interests, it was prejudicial error to admit evidence of the insured's death by homicide shortly after procurement of the policy. [498-501]

At the trial of an insurance broker, a physician, an attorney, and a businessman on charges arising out of their procurement of an insurance policy on the life of the president of a company in which the attorney and the businessman had substantial financial interests, the broker and the physician were not entitled to a severance or a mistrial by the fact that the attorney called as a witness a partner in the law firm which was representing the businessman and the Commonwealth called as rebuttal witnesses two other members of the same law firm. [501-502]

A Massachusetts court properly had venue of indictments for uttering a forged life insurance policy to the insurance company located in Missouri where the forgery occurred in Massachusetts, the claim form under the policy was signed in and sent from Massachusetts, and the intended beneficiaries, as well as the insured, were residents of Massachusetts. [502-503]

At the trial of an insurance broker on charges arising out of his forgery of a signature on an insurance application, the judge did not err in refusing to permit the defendant to introduce evidence of his practice of signing names of customers to insurance applications. [503-504]

INDICTMENTS found and returned in the Superior Court Department on July 6, 1978.

The cases were tried before *Irwin,* J.

*John P. White, Jr. (Michael H. Riley* with him) for Irwin Jacobson.

*Ellen Y. Suni (Jack I. Zalkind* with her) for Robert Effenson.

*Gerald Alch* for Barry Levin.

*James D. St. Clair (Christina L. Harms* with him) for Earle Groper.

*John P. Kivlan,* Assistant District Attorney *(Charles J. Hely,* Assistant District Attorney, with him) for the Commonwealth.

NOLAN, J.  This case arises out of an insurance policy procured by the defendants in the face amount of $800,000 on the life of George Hamilton issued by Charter National Life Insurance Company (Charter) of St. Louis, Missouri.  Irwin Jacobson was a physician, Robert Effenson, an insurance broker, Barry Levin, a practicing lawyer, and Earle Groper, a businessman and a nonpracticing lawyer.  Indictments charging each of them except Jacobson with forgery (G. L.  c. 267,  § 1),  uttering  (G. L.  c. 267,  § 5), fraudulently obtaining signatures by false pretenses (G. L. c. 266, § 31), larceny (G. L. c. 266, § 30), and attempted larceny (G. L. c. 274, § 6) were returned on July 6, 1978. Jacobson was indicted for all these offenses except uttering and attempted larceny.  Additionally, on the same day, Jacobson was indicted for making false representations as an insurance medical examiner in connection with an insurance policy (G. L. c. 175, § 127) and Effenson for making false representations as an insurance broker (G. L. c. 175, § 127).  They all were arraigned and pleaded not guilty on July 7, 1978.  A joint trial to a sequestered jury commenced on January 22, 1979, and jury verdicts of guilty were returned on March 5, 1979, except as to the indictments for forgery and fraudulent obtaining of signatures against Groper and the indictment for attempted larceny against Effenson.  On these latter three indictments, the jury re-

turned verdicts of not guilty. All defendants have raised multiple issues on appeal. The convictions must be reversed for the reasons set forth in part 3, *infra*.

1. *A Synopsis of the facts.* In this apercu we recite only those facts which could be found by the jury on the basis of the evidence introduced as part of the Commonwealth's case, viewed in the light most favorable to the Commonwealth. The defendants Levin and Groper had been close friends from their school days and before 1973 had participated in at least three ventures in which they had together invested money in business corporations and become officers thereof. In 1973 they went into a venture with George Hamilton to form a corporation to engage in the retail furniture business. The company was located in Braintree and was called Hamilton's, Inc. Much of the original financing for the company consisted of cash payments evidenced by notes of the company. The original noteholders were Groper ($195,000), Levin ($83,000), three small business investment corporations (SBIC) ($150,000), and Hamilton ($66,000, $50,000 of which he obtained from a bank of which Groper was a director. Groper, Levin and one Birnbach, Groper's brother-in-law, guaranteed the note). The Hamilton's, Inc., notes specified that the corporation would take out a life insurance policy on Hamilton with the corporation designated as beneficiary, subject to an assignment of the proceeds for the benefit of the noteholders. The company purchased such a policy from Boston Mutual Life Insurance Company on December 26, 1973, payable to Hamilton's, Inc., on Hamilton's death. The policy was for $1,000,000, twice the amount of the then outstanding notes. Hamilton had submitted to a physical examination for this policy. This policy does not figure in the indictments in this case, although the defendant Effenson was the broker.

The type of insurance taken out is known as key man insurance. It enables a company to insure the life of a person whose continued services are critical to the financial success of the company's business. Hamilton was the only one of

the original investors who knew the furniture business. He had been a vice president of J. Homestock, another large furniture retailer. (Groper was president of a liquor wholesaler.) Hamilton was the creator of the concept underlying the store, of its characteristic and unique method of retailing. Hamilton became president; Groper, chairman of the board; Levin, treasurer.

The store opened in September, 1974. It lost money from its inception. In May, 1975, Groper lent the company $180,000 and Levin $40,000 and took back notes (the Series A notes) in those amounts from the company. By August the company had lost a million dollars or more. New money was required to keep the company breathing. At that time Groper put in an additional $200,000. Two new investors, Hannaford and Slater, put in $200,000 and $150,000 respectively. (Hannaford was associated with the corporation from which Hamilton's, Inc., leased its building; Slater was one of Groper's codirectors at the bank.) Levin put in an additional $15,000. Notes (Series B) were issued to cover the new financing.

The company's infelicitous financial start had caused Groper and Levin to become disenchanted with Hamilton and his performance as president. By the autumn of 1975 Groper had engaged Coopers, Lybrand to conduct a talent search for Hamilton's replacement.

At a meeting of the board of directors on December 22, 1975, Levin asked the members to approve the purchase of an additional policy on Hamilton's life in the amount of $800,000. One of the directors questioned the need for such a policy. Groper supported Levin, contending that the policy was required as part of the legal boilerplate of the Series B notes. Levin and Groper were the only lawyers on the board; they presumably knew that the insurance provision could be waived by the noteholders. (All the Series B holders were members of the board of directors, and all but Slater were present at the December 22 meeting.) The board voted approval of the additional insurance. After the December 22 meeting, Effenson, an insurance agent and

broker who was a long-standing friend of Levin, submitted an application for an additional $800,000 policy to Mutual Benefit Life Insurance Co. Such a policy would have resulted in total key man insurance outstanding on Hamilton's life and payable to the company in the amount of $1,800,000, well in excess of the outstanding notes.

Soon after the December meeting, relations between Hamilton and Groper and Levin deteriorated and became openly hostile. Hamilton told one employee after that meeting that he was "shocked" that Groper and Levin wanted more insurance on his, Hamilton's, life and that he would not go along with it, that he did not want an additional policy to go into effect. In January, Hamilton learned that Groper had offered the presidency to one Corrio.[2] Hamilton on the one hand, and Groper and Levin on the other, actively sought to arrange for a sale of the company whereby one group could obtain control and oust the other. The animosity between the parties was evident to employees of the company. Loud shouting was overheard on one occasion, and one employee observed that Hamilton was not speaking to Groper or Levin in January and February except when necessary. Groper freely blamed the company's troubles on Hamilton in his negotiations with other companies, and in at least one conversation with a middle echelon employee, Groper made vulgar or disparaging remarks concerning Hamilton.

During this period Effenson was encountering difficulties in placing the $800,000 policy which had been applied for after the December 22 meeting. Mutual Benefit Life Insurance Company rejected the application in late January on the ground that $1,000,000 of business insurance then in force should be sufficient for normal business needs.

In late February Effenson called on one Forti, who was a general agent for Charter, a carrier specializing in high risk

---

[2] During January and February, 1976, Groper also engaged in discussions with other persons to whom he offered Hamilton's job without Hamilton's knowledge.

and substandard cases. Charter required two medical examinations. Forti told Effenson that Charter would accept a Mutual Benefit examination in fulfilment of its requirement of one examination but that Hamilton would have to submit to a second examination.

On March 2, 1976, Effenson delivered to Forti's secretary parts I and III of an application for insurance on Hamilton's life in the amount of $800,000. The application purported to bear Hamilton's signature in two places. The binder form had been torn from the bottom of part I. Effenson asked her for another binder receipt, which she typed in for him, indicating that the binder amount was to be $500. Effenson forwarded the binder to Levin. On March 5, Levin issued a corporate check for the $500 without going through an agreed upon procedure of discussing the bill first with the controller of the corporation — a procedure which applied to all disbursements in excess of $200, a control measure in response to the severe liquidity problems of the corporation. (Substantially all large bills were, at that time, being put in a 30-day "tickler" file; at the end of thirty days most were then put in another 30-day "tickler" file.)

On March 12, in response to an inquiry from the home office of Charter in St. Louis, Mo., Forti's secretary called Effenson to ask for the medical exam portion of the application (part II). Effenson said that he had had trouble arranging for Hamilton to see Dr. Jacobson (a friend of Effenson and a frequently used examiner in Charter applications), that Hamilton was a busy man, and that he would arrange something soon. The secretary received the completed medical application form signed by Dr. Jacobson and purportedly by Hamilton on March 14 and forwarded it to Charter.

The jury could properly infer that, in fact, Hamilton knew nothing about the Charter application. His signature had been written for him on the application and the medical form by someone trying to imitate his signature. Effenson was later to admit to Forti that he (Effenson) had signed Hamilton's signature to the Charter policy applica-

tion and medical examination forms, that he had done so because "Hamilton would not cooperate with anyone, . . . that he might not have been interested in any more insurance, . . . that he had done this just to do somebody a favor." Jacobson later admitted to Forti that he had never performed the medical examination on Hamilton. In a conversation with a friend two weeks before his death in which Hamilton made remarks which may be taken as an indication of concern on his part about the sizable amount of insurance out on his life, he spoke only of the $1 million Boston Mutual Life policy. The jury could infer that Hamilton at that time (mid-April, 1976) still had not learned that the $800,000 Charter policy was in effect.

In March, Hamilton together with Hannaford gave Groper and Levin a formal offer by a business firm to purchase the company on condition that Groper, Levin and all other officers except Hamilton be removed. The deadline for acceptance of this offer was March 19, 1976. During this period Groper and Levin were also engaged in discussions with officers of several successful furniture retailing operations to see if they could arrange for a sale of the assets of Hamilton's, Inc., or a sale of a major share of the corporation, to them. A common theme of those negotiations and offers was that Hamilton was to be replaced as president of the corporation and that Groper and Levin were to continue to be involved as directors and owners of a share of the business.

Groper and Levin decided on a sale to Scandinavian Design, Inc. (Scandinavian), and on March 19, 1976, directed their counsel to prepare necessary resolutions for the meeting of the company's board of directors on March 23, 1976. On this date, the board met with Groper presiding and Levin present and formally approved the sale to Scandinavian, the closing to take place on May 3, 1976. At the meeting of March 23, Hamilton was asked to resign, but he refused.[3]

---

[3] There was evidence that Hamilton wanted to be fired rather than quit so as to be relieved of the terms of a restrictive covenant which would prevent him from competing with Hamilton's, Inc.

At Hamilton's direction, an administrative assistant cleaned out his desk on March 24 and brought the contents to Hamilton's home. Hamilton never returned to the company offices after his departure on March 23, 1976. One Kurlansky, an executive vice president of Scandinavian, took on the day-to-day functions of president of Hamilton's, Inc., even though the transfer of ownership had not yet been effected.[4]

An underwriter at Charter, in response to a telephone call received on March 24, 1976, authorized the issuance of the policy for $800,000 in which the company was named beneficiary, though he did not know of the imminent sale of the company to Scandinavian nor the departure of Hamilton from the company. The policy was dated March 26, 1976, though it was effective for the binder period of fifty-nine days from March 5, 1976, until May 3, 1976.

After Forti received the policy, it was transmitted to Effenson with instructions not to deliver it to the company until he received the balance of the premium, $2,539. Violating these instructions, Effenson delivered the policy to Levin without receiving the balance of the premium.

Groper executed a document denominated an assignment on April 2, 1976, which purported to assign the Charter policy from the company (the beneficiary and owner of the policy) to a trustee for benefit of the Series A and B noteholders. Levin took Groper's acknowledgment as notary public. Groper and Levin held notes in these series in the amount of $435,000. Levin directed that Hamilton be removed from the payroll effective April 3, 1976, the day after the assignment was made. Groper approved that decision and had previously directed the payroll clerk to give him Hamilton's checks.

Levin continued to urge payment of the balance of the first year premium on the $800,000 policy. On April 5,

---

[4] Kurlansky had cards printed describing him as president of Hamilton's, Inc., and also wrote letters signed by him as president, even though his contemplated election to that position by the board of directors had not yet taken place.

1976, after a directors' meeting, he approached Hannaford, who indicated that the expenditure should not be made. Hannaford told Levin that he believed that "no insurance company in their right mind would ever pay off on a policy given the financial condition of the company and given the fact that George [Hamilton] was either not or was soon not to be connected with the company." Levin responded that there would be no problem because there had been an insurable interest at the time the policy was taken out. He also told Hannaford that he agreed with him that the premium was an unnecessary expenditure but that Groper had directed that it be paid. Hannaford remained opposed to payment and asked for confirmation of his opposition in writing. On April 6, 1976, a letter addressed to Hannaford was signed by Levin, which stated that Hannaford, as a noteholder, had waived any requirement of insurance on Hamilton's life for Hannaford's benefit.

When Levin approached Kurlansky (the de facto president of the company) about paying the balance due on the premium, he was rebuffed. Kurlansky told Levin that all policies on Hamilton should be cancelled. Forti notified Effenson on April 21, 1976, that the Charter home office had advised that Effenson had ten days within which to obtain the balance of the premium or return the policy. Effenson made many calls to Levin's office. Levin cancelled a board of directors meeting which had been scheduled for April 23, to consummate the sale to Scandinavian and to remove Hamilton formally as president.

Hamilton was killed by gunshot wounds at his home on Sunday morning, April 25, at 4:00 A.M. The death was a homicide. That night Effenson called Forti and said that he had talked with Levin and that a claim was to be filed on the $800,000 policy. On Tuesday, April 27, a police investigator talked with Levin and Groper at the store, and, in response to an inquiry about insurance coverage on Hamilton's life was told by Levin, in Groper's presence, "I don't know. Just the usual $50,000, I think." Another police investigator, in response to the same question, was told

by Levin about the $1 million policy but not the $800,000 policy.

Within a few days after Hamilton's death, Groper and Levin, as well as others, were present at a meeting at the company's offices. Levin, while at the meeting, telephoned Mrs. Chambers, the payroll clerk, and asked her to write a letter to Mrs. Hamilton indicating that Mrs. Chambers had made an error and had inadvertently taken Hamilton off the payroll. She was also instructed to prepare additional checks payable to Hamilton for the intervening period after April 3, the date as of which Levin had instructed her to have Hamilton removed from the payroll. After calling her attorney, Mrs. Chambers refused to write the letter (and so informed Levin) unless he would put the request in writing. She prepared the checks and gave them to Levin, who signed them. These checks were received and cashed by Mrs. Hamilton some time in May.

On April 27, 1976, Charter notified Forti that, because the conditions for delivery of the policy had not been met, it was returning the binder deposit. Charter issued a refund check to Hamilton's, Inc., on April 28. On May 13, 1976, a claim was submitted to Charter. Levin signed the claim form on behalf of the company and Groper witnessed it. The claim form listed Hamilton's "date last worked" as "April 25, 1976," and also stated that Hamilton's occupation at the time of his death was "President/Hamilton's, Inc." Charter refused to pay.

2. *Motions for directed verdicts.* All defendants filed motions for directed verdicts (now denominated motions for required findings of not guilty according to Mass.R.Crim.P. 25, 378 Mass. 896 [1979]) at the close of the Commonwealth's presentation of evidence in its case in chief. We are required to sustain the denial of such a motion if "there was enough evidence that could have satisfied a rational trier of fact of each . . . element beyond a reasonable doubt." *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678

(1979). Our examination will focus exclusively on the evidence introduced "up to the time that the Commonwealth rested its case." *Commonwealth v. Kelley,* 370 Mass. 147, 150 (1976). Our analysis of the evidence will be in the light most favorable to the Commonwealth. *Commonwealth v. Budreau,* 372 Mass. 641, 643 (1977). The denial of the motions for directed verdict will be sustained if the inferences which may be drawn from the evidence are warranted and not too remote. *Commonwealth v. O'Brien,* 305 Mass. 393, 401 (1940). However, the inferences need not be necessary or inescapable if they are reasonable and possible. *Commonwealth v. Medeiros,* 354 Mass. 193, 197 (1968), cert. denied sub nom. *Bernier v. Massachusetts,* 393 U.S. 1058 (1969). *Commonwealth v. Beckett,* 373 Mass. 329, 341 (1977). *Commonwealth v. Chinn,* 6 Mass. App. Ct. 714, 716 (1978).

a. *Forgery* - Forgery consists of falsely making, altering, forging or counterfeiting any instrument described in the appropriate statute. G. L. c. 277, § 39. The particular statute, G. L. c. 267, § 1, punishes one for forgery who "with intent to injure or defraud, falsely makes, alters, forges or counterfeits a . . . policy of insurance." Effenson admitted to Forti that he had signed Hamilton's name to the application because he could not induce Hamilton to cooperate. Hamilton would not submit to another medical examination because the bloom was off the rose in Hamilton's relationship with Levin, Groper and the company. Jacobson also admitted to having fabricated that portion of the application which consisted of the medical examination as a favor for Effenson. Jacobson copied the results of an earlier insurance medical examination and passed it off as an examination for this policy. Jacobson exhibited contrition but repeated, "To do a favor, I am getting it in the neck." There was no error in denying the motions for directed verdicts of Effenson and Jacobson.

In the opinion of a majority of the panel, there was no error in denying Levin's motion for a directed verdict on the forgery indictment. There is ample evidence that he acted

for the company and with Effenson in procuring the issuance of the policy. He is therefore liable as a principal if the signatures of Hamilton were forged with his approval, regardless of whether he participated personally in the writing of those signatures.

There was no direct testimony concerning his knowledge of Effenson's unauthorized signings of Hamilton's name and Jacobson's false medical report. Such knowledge may be inferred, in the opinion of the majority, from all the evidence, including the longstanding relationship between Effenson and Levin; the fact that Effenson was trying to obtain the policy on Levin's instructions; that the policy was applied for and obtained during a period of time in which the relationship between Hamilton on the one hand and Levin and Groper on the other had deteriorated to a point that Hamilton's cooperation in procuring a policy substantially for their benefit would not be obtainable; that Effenson, by his admission to Forti, did not forge Hamilton's signature for his own (i.e., Effenson's) benefit,[5] but as a favor for some other person; that, inferentially, that person was Levin, who was Effenson's friend and the person who acted for the company in obtaining the policy; and that (again, inferentially) it was not the sort of favor that one would do for a friend without approval, involving, as it did, acts of criminality. Levin's subsequent actions, including his attempt to have the payroll clerk conceal Hamilton's removal from the payroll, his concealment of the existence of the insurance policies on Hamilton's life from the authorities investigating Hamilton's death, and his falsification of certain information on the claim form show a continuance of a pattern of falsification. From all the evidence the jury could properly draw an inference that Effenson did not conceal from Levin the steps he took to procure issuance of the poli-

---

[5] There was evidence that Effenson would have stood to receive a commission of thirty percent of the first year premium and five percent of any renewal premium.

cy but acted in consultation with Levin and with his approval.[6]

b. *Obtaining signature by false pretenses* - The statutory elements of this crime consist of (1) obtaining the signature of a person to a written instrument; (2) the false making whereof would be a forgery; (3) by a false pretense; (4) with intent to defraud. G. L. c. 266, § 31. There was evidence from which a rational jury could find beyond a reasonable doubt, *Commonwealth* v. *Latimore*, 378 Mass. at 677, that both Effenson and Jacobson obtained the signatures of the President and Secretary of Charter when Charter issued the insurance policy on the forged application and medical examination. All elements of the crime are present and the jury could properly have found Effenson and Jacobson guilty. See *Commonwealth* v. *McHugh*, 316 Mass. 15, 22 (1944). A majority of the panel, on the basis of its conclusion in part 2(a) above that there was evidence which warranted an inference that Levin knew of Effenson's forgeries and acted in concert with him in procuring the issuance of the policy, conclude that there was no error in denying Levin's motion for a directed verdict on the indictment for obtaining signatures by false pretenses.[7]

c. *Larceny* - The elements of larceny by false pretense which is the species of larceny here under review consists of a (1) taking and carrying away of personal property (2) with intent permanently to deprive a possessor or owner (3) by representation of a material fact (4) knowing such representation to be false (5) intending the victim to act on it, and (6) the victim must act on it. *Commonwealth* v. *Green*, 326 Mass. 344, 347-348 (1950). *Commonwealth* v. *Kiernan*, 348 Mass. 29, 46 (1964), cert. denied sub nom. *Gordon* v. *Massachusetts*, 380 U.S. 913 (1965), and cases cited.

---

[6] The author dissents from the conclusion expressed in this paragraph and would reverse the trial judge's denial of Levin's motion for a directed verdict on the forgery count.

[7] The author dissents from this conclusion of the majority, based on his view that the evidence was insufficient to warrant an inference beyond a reasonable doubt that Levin knew of Effenson's or Jacobson's forgeries.

An insurance policy is "property" within the statute because it is a "valuable contract in force". G. L. c. 266, § 30(2), as appearing in St. 1945, c. 282, § 2. That Charter refused to pay does not render it valueless because it may be required to pay if the company recovers a judgment against it.

The admissions by Effenson and Jacobson are sufficient evidence of their acts and intent. Clearly, a rational jury could find beyond a reasonable doubt in their conduct the constituent elements of larceny. Therefore, it was not error to deny the motions of Effenson and Jacobson for directed verdicts.

A majority of the panel hold that it was not error to deny the motion of Levin for a directed verdict on the indictment for larceny of the policy. This conclusion is based on their conclusion stated in parts 2(a) and 2(b) above, that the evidence warranted the inference that Levin knew of Effenson's acts and cooperated with him in procuring the issuance of the policy.[8] A majority of the panel conclude, however, that the evidence was not sufficient to warrant a finding beyond a reasonable doubt that Groper, at the time of the policy application, had knowledge of the forgeries and false representations contained therein. A majority hold, therefore, that Groper was entitled to the allowance of his motion for a directed verdict on the indictment for larceny of the policy.[9]

d. *Uttering* - The crime of uttering consists of four elements: (1) offering as genuine; (2) an instrument; (3) known to be forged; (4) with the intent to defraud. A majority of the panel conclude that there was evidence that

---

[8] The author dissents on this point for the reason stated in footnote 7, *supra*.

[9] Armstrong, J., dissents on this point, concluding that the evidence taken as a whole warranted an inference beyond a reasonable doubt that Groper and Levin acted in concert in all matters relating to Hamilton, Inc., that Levin acted, in effect, under Groper's direction and control in all such matters.

Levin and Groper offered as genuine the insurance policy containing the application signed by Hamilton knowing the latter's signature to be forged.[10]

The actions of Levin and Groper in relation to the policy showed that they were not above falsification of records to insure payment by the insurance company. Levin's activities showed a clear concern, despite his earlier assurances to the contrary to Hannaford, that the insurance company might raise a question as to whether there was an insurable interest on Hamilton's life in view of his removal from the payroll and his de facto ouster as president. Two questions on the claim form related to Hamilton's activities. One asked "date last worked"; the other, "occupation at death." The answers, "April 25, 1976," and "President/Hamilton's, Inc.," could have been found by the jury to be deliberately misleading. These statements were inserted by Levin and Groper at a time when they would have been expected to have prepared the form with the utmost of care. Charter had already taken the position that the policy was not in force. Levin and Groper, the principal beneficiaries of the policy, were lawyers. They not only examined the form themselves, as was evident by their signatures, but they sought legal advice before submitting the claim. In fact, the submission to the insurer was made under cover of a letter from their attorneys.

The jury (the majority conclude) could also have inferred for the reasons stated in 2(a), above, that Levin knew of the forgery of Hamilton's signatures from the outset. The evidence warranted a finding that Groper knew of that fact at least by the time that he and Levin prepared and submitted the claim. The instructions printed on the reverse side of the claim form required, in addition to the form, the submission of the policy and the certificate of death to the insurance company. These documents would clearly be examined minutely by Groper before submission. He was aware that the insurance company and its lawyers would

[10] The author dissents from this conclusion.

look for any possible problems. The application purportedly signed by Hamilton in late February, and the medical application purportedly signed by him in early March, were integral parts of the policy. Even in the unlikely event that Groper had not known earlier that Hamilton's signature had been forged, the inference is warranted that he knew that fact at least by May when he examined the policy. In view of the deep hostility between Hamilton and Levin and himself at the end of February and early March, Groper had to know that Hamilton would not at that time have cooperated to benefit Levin and Groper. A jury could properly have found that the February and March dates appearing next to the purported signatures of Hamilton were sufficient to put Groper on notice that the signatures were forged. His willingness to present the policy to the company despite the forgery was consistent with and made plausible by his willingness to make his own misstatements in pursuing the claim. Moreover, the falsifications on the claim form were also consistent with Levin's earlier request, in Groper's presence, to the payroll clerk that she write falsely that it was her inadvertent error which led to Hamilton's removal from the payroll. Accordingly, it was not error to deny the motions for directed verdicts on the charge of uttering by Levin and Groper. However, as to Effenson, the only evidence which may be considered in this connection is his call to Forti more than two weeks before the claim was filed, telling him that such a claim would be filed. This evidence falls measurably below what would be required to show that Effenson was a party to the making of the claim. Accordingly, his motion for a directed verdict on uttering should have been allowed.

3. *Evidence of Hamilton's homicide.* Evidence which is otherwise competent is not rendered inadmissible simply because it may tend to prove the commission of another crime. *Commonwealth* v. *Caine,* 366 Mass. 366, 370-371 (1974). *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 815-816 (1973). Nevertheless, evidence which is relevant to the crime charged may be excluded if its probative value is

"outweighed by the danger of prejudice which cannot be corrected by instruction or by reliance on the good sense of the jury." *Commonwealth* v. *Caine, supra* at 371. *Commonwealth* v. *Kines,* 5 Mass. App. Ct. 632, 634, cert. denied, 434 U.S. 1076 (1977).

We conclude, after reviewing the entire record, including the judge's instructions, that all defendants were irreparably prejudiced by the introduction of Hamilton's homicide. At the outset, the Commonwealth in its opening statement to the jury made capital of the homicide and the defendants' objections were overruled.[11]

---

[11] "The evidence will show that on April 23 there was supposed to be a board meeting at Hamilton's, Inc., which was set up by Mr. Levin, and the purpose of the board meeting was to dispose of all the loose ends that were necessary to make this final closing and sale to Scandinavian Design take place. One of the subjects was the removal of Mr. Hamilton as president of the company, or his resignation. Among other things, the cancellation of the policies was to take place, if not on that date, no later than May 3. This meeting was canceled. The evidence will show Mr. Levin notified everybody that the meeting was going to be postponed for a week.

"On Sunday morning, April 25, Mr. Hamilton was shot to death. Evidence will show it was a homicide. That night, approximately 6 p.m., Mr. Effenson called the insurance broker, Mr. Forti, and made him aware of the day's news, and told him to get the process going for the claim on the $800,000.

"The following day, Monday, the 26th, the day after the shooting, Sergeant Ruane of the Canton Police Department will tell you he went over to Hamilton's to interview various employees and he had occasion at one point to be in an office with Mr. Groper and Mr. Levin.

". . . .

"The evidence will show that on the following day, the 27th, two days after the shooting, it was public knowledge that there was a million dollars of insurance on Mr. Hamilton's life.

". . . .

"The evidence will show that during the same week, a controversy arose as to whether or not Mr. Hamilton was on the payroll at the time of the shooting on April 25.

". . . .

"Now, during the week just after the shooting that I have just described to you where the police had those conversations,

The judge gave cautionary instructions after the opening and again in his final charge to the jury but the damage had been done.[12]

Additionally, the death certificate which carried the legend "gunshot wound of chest with (L)aceration . . . Homicide" was introduced in evidence without appropriate deletion.

Moreover, the record is replete with references to the fact that Hamilton had been "killed," had been "shot" and to the "shooting" of Hamilton.

Although it may be argued that the jury is entitled to a complete picture of the events (See *Commonwealth* v. *Young,* 382 Mass. 448, 463 [1981]), the prejudice of such homicide evidence to the defendants is almost overwhelming. Further to their detriment, the defendants were denied any discovery concerning the homicide after the ruling was made permitting such evidence. See *Commonwealth* v. *Lewinski,* 367 Mass. 889, 901-903 (1975). Such denial exacerbated an otherwise disastrous problem for all defendants. Groper and Levin stood to profit directly from Hamilton's speedy demise. Effenson and Jacobson might well have been painted with the same brush and this reasoning was probably not lost on the jury. In all, it was prejudicial error to permit evidence of Hamilton's homicide particularly where the Commonwealth was not required to disclose and the defendants were not permitted to discover and rebut the evidence, if any, which the Commonwealth might have to connect them to the homicide.

---

".   .   .   .

"one of the questions on the claim form is 'Date last worked.' The evidence will show they put down April 25, the date of the shooting.
".   .   .   .

"that on the date or shortly thereafter of the shooting and killing, the homicide, of Mr. Hamilton, they took this policy — that is, Mr. Groper and Mr. Levin."

[12] In a lobby conference, the judge conceded that the death of Hamilton "(s)eem[ed] to be hanging over the trial."

In view of our decision to reverse the convictions for the reason set forth in this part 3, we only discuss those issues likely to arise on a retrial.

4. *Change of venue.* This issue will take on less importance on a new trial because at least five years will have elapsed since Hamilton's death. As a result of our ruling in part 3, all prospective jurors who are aware of the homicide should be excused for cause. We leave to the discretion of the judge to determine, on retrial, whether a change of venue will be needed. See *Commonwealth* v. *Vitello,* 367 Mass. 224, 236-238 (1975).

5. *Motion to sever.* The law firm which represented the corporation as well as Levin and Groper from the outset of its operation was also trial and appellate counsel for Groper. Levin called as a witness a partner of that firm. The Commonwealth called two other members of the same law firm as witnesses in rebuttal. Before it was clear that a defendant would call this partner (originally, it was speculated that the Commonwealth would call him), Groper told the judge that he understood the potential problem of having trial counsel from the same firm as a possible witness and that he wished, nevertheless, his trial counsel to stay in the case. His counsel advised the judge that he had carefully considered the possibilities and that he thought that these circumstances would not prevent him from effectively representing Groper. However, Jacobson and Effenson complain that prejudicial admissions by Groper would be taken by the jury against them because they were being tried on the predicate of a joint undertaking. The argument of Jacobson and Effenson seems to be that the testimony of the member of the law firm would be given added credibility because of his station as a lawyer and because it was adverse to the interests of the firm's client, Groper. While that may be so, an examination of the testimony of all the firm members fails to reveal anything detrimental to Jacobson and Effenson. A motion to sever is ordinarily addressed to the judge's discretion. See *Commonwealth* v. *Clark,* 5 Mass. App. Ct. 673, 677 (1977). The judge did not abuse his dis-

cretion in denying the motion for severance and mistrial.[13] Compare *Universal Athletic Sales Co.* v. *American Gym,* 546 F.2d 530, 539-540 (3d Cir. 1976), cert. denied sub nom. *Super Athletics Corp.* v. *Universal Athletic Sales Co.,* 430 U.S. 984 (1977). Compare and contrast *Commonwealth* v. *Rondeau,* 378 Mass. 408, 415 (1979).

6. *Venue of uttering.* The defendants argue that the venue, if not the jurisdiction, of the indictment for uttering is outside Massachusetts. They were indicted for uttering the Charter policy. The trial judge allowed the Commonwealth's motion to proceed under the mantle of G. L. c. 277, § 57A, set forth in the margin.[14] This statute presupposes the existence of doubt as to the venue and the defendants urge the proposition that there should have been no doubt that the uttering, if any, was not complete until Charter received the policy in St. Louis, Missouri. The defendants' argument is faulty for failing to recognize where the intended harm took place. "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power." *Strassheim* v. *Daily,* 221 U.S. 280. 285 (1911). *Commonwealth* v. *Carroll,* 360 Mass. 580, 585 (1971). Clearly, the detrimental effect was intended to take place in Massachusetts.

---

[13] We do not want to be understood as approving of this law firm in sailing so close to the shoals of questionable conduct. Our inquiry is limited to the question of reversible error and we do not attach our imprimatur to this conduct.

[14] "A defendant shall not be discharged for want of jurisdiction if the evidence discloses that the crime with which he is charged was actually committed without the county or the territorial jurisdiction of the court in which he is being tried; provided, that the attorney general or the district attorney petitions to the court before proceeding with the trial for leave to proceed, stating that he is in doubt from the state of the evidence then in his possession as to whether or not the crime was committed within the county or the territorial jurisdiction of the court, and the court after hearing said petition orders the trial to proceed."

7. *Admission of background facts concerning Groper and Levin.* The judge permitted the Commonwealth to introduce a stipulation tending to show a longstanding friendship between Groper and Levin. The Commonwealth has a right to demonstrate the relation of parties to a joint undertaking. See *Commonwealth* v. *Pickles,* 364 Mass. 395, 400 (1973).

8. *Custom and usage.* Effenson urges as error the refusal of the judge to permit evidence of his practice of signing the names of customers to insurance applications. He wanted to call four witnesses (present in court) who were customers of his and who would have testified that he had signed their names to insurance applications with their authority and consent. On direct examination, Effenson had testified that he was authorized by Hamilton to sign his name to the application. Effenson did not indicate in an offer of proof the manner in which authority was given to him by the four witnesses. The witnesses had no connection with the Charter policy or, for that matter, with Hamilton. More importantly, Effenson failed to lay the proper foundation "that any such custom of the trade was sufficiently widespread or generally understood" so as to permit such evidence. *Thibeault* v. *George W. Pickering Co.,* 2 Mass. App. Ct. 421, 423 (1974). Without this foundation, such evidence suffers from the vice of res inter alios acta. Cf. *Commonwealth* v. *Cutler,* 356 Mass. 245, 248-249 (1969).

9. *Other rulings on evidence.* a. Hamilton's state of mind was properly considered material by the judge who permitted evidence tending to show mutual displeasure among Hamilton, Groper and Levin. See *Commonwealth* v. *Trefethen,* 157 Mass. 180, 188 (1892). b. An agent of Charter was permitted to testify as to the period of coverage purchased by the payment of $500 and the length of time an insurance policy is in effect when it is delivered without receipt of the full first year premium. He did not offer a conclusion as to whether the policy was in force. His was not an opinion on a matter of law. There was no error. See *Bachand* v. *Vidal,* 328 Mass. 97, 102 (1951). Compare and

contrast *Foley* v. *Hotel Touraine Co.*, 326 Mass. 742, 745 (1951). c. There was no error in permitting the evidence as to key man insurance.

The judgments appealed from are reversed, and the verdicts set aside. Judgment is to enter for the defendant Groper on the indictment charging larceny of the policy. Judgment is to enter for the defendant Effenson on the indictment charging uttering. The other cases are remanded to the Superior Court for retrial or such other further proceedings as are consistent with this opinion.

*So ordered.*