NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1010

COMMONWEALTH

vs.

JOHN J. DONOVAN.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a jury trial in the Essex Superior Court, the defendant, John J. Donovan, appeals from the following twelve convictions:  forgery (seven counts), uttering, filing a false document with the registry of deeds, obtaining a signature by false pretenses, making a false statement under penalty of perjury, and attempting to commit larceny.  The trial judge entered a required finding of not guilty on an indictment charging witness intimidation.  On appeal, the defendant raises numerous claims of error.  We affirm.

Background.  The convictions relate to twenty-five documents filed by the defendant on September 12, 2016, at the Essex registry of deeds.  A number of these documents (codicil,

deeds, appointment of successor trustee, trustee certificate, mortgages, and special power or attorney) included forged signatures of the defendant's son, John, who died on April 25, 2015. Other documents included forged attestations of two notaries and an affidavit obtained from one notary through false pretenses. The documents also included the defendant's false affidavit filed in connection with the forged power of attorney and forged codicil. Simple in its objective but complex in its execution, the scheme sought to grant the defendant broad powers over his son's property while depriving the son's widow and children of their interests in the property.

The scheme unraveled when Attorney Miranda Siemasko, who previously represented the defendant's son, reviewed the twenty-five documents filed by the defendant. During 2016, Attorney Siemasko worked to carry out the son's wishes regarding the disposition of 120 acres of land in Hamilton that the son had controlled through Donovan Conservation, LLC. Upon review of the twenty-five documents filed by the defendant in September 2016, Attorney Siamasko noted the following: (1) the defendant's wife, not Donovan Conservation, LLC, owned the land in Hamilton; (2) the defendant's wife mortgaged the property to the defendant's friend, "which would have meant that there would be no money going back to the [son's] estate"; (3) the son discharged a $4.8 million civil judgment against the defendant;

2

(4) the son discharged a mortgage on 120 acres of land owned by the defendant in Essex; (5) the defendant granted the defendant a power of attorney; and (6) the son executed a codicil to his will. The codicil represented an about-face from the son's will and purported to appoint the defendant as additional personal representative and executor with powers to carry out numerous tasks. These documents filed by the defendant effectively thwarted the son's plans for selling the Hamilton property, had not been contemplated when the son made plans to settle his affairs, and benefited the defendant.

At trial, two witnesses testified that while fresh out of college they worked in the defendant's office and typed documents at his direction. One of these witnesses testified, under an immunity agreement, that the defendant stood over his shoulder and dictated text to be typed into documents. He also testified that the defendant maintained a database that contained an image of the signature of the defendant's son. At the defendant's direction the employee copied that image into documents after the son's death. The employee, unhappy and uncomfortable about carrying out these directives (particularly adding the son's signature to documents after his death) expressed his concerns to the defendant. A second employee specifically identified numerous trial exhibits which had been filed in the registry of deeds by the defendant, as those that

3

she typed as the defendant dictated the text (including exacting details such as character spacing and tabs) in August and September 2016. At times during dictation, the defendant mimicked the voice of his son. She also accessed a database that included images of the signature of the defendant's son as well as a notary signature and notary stamp. She affixed the images to documents at the defendant's direction. After expressing concerns to an attorney who worked in the defendant's office, she was never again asked to work with the defendant.

One notary public, Michael Givens, testified to irregularities in his notary attestations on the trial exhibits that had been filed by the defendant at the registry of deeds. According to Givens, he notarized three of these documents (confirmation and acknowledgment, power of attorney, and codicil) for the defendant in 2016 on September 6 and 12. When shown the power of attorney with whiteout covering some text, Givens testified that he would not have notarized a document with whiteout and would have required a clean copy. When shown a copy of the two-page codicil with his standalone notary signature on an otherwise blank page, Givens testified that he would not have notarized a blank page. Givens also noted that when he affixed his notary signature to the codicil, the defendant appeared excited and made emotional, celebratory gestures with his hands and arms.

4

A second notary public, Robert Clocher, testified that at the defendant's request he signed an affidavit (prepared by the defendant) on August 15, 2016. At trial, when shown the affidavit recorded by the defendant at the registry of deeds, however, Clocher testified that a handwritten line in the affidavit was not present when he signed it, and he would not have signed the affidavit with such language. The handwritten line, bearing Clocher's encircled initials, referenced attached documents also bearing the same initials. There were no initials or attachments when Clocher signed the affidavit. When shown sixteen of the twenty-five documents that the defendant filed at the registry of deeds, Clocher denied notarizing any of them despite the documents bearing what purported to be his signature and notary stamp.

Another notary public, Gina Flynn, also denied that exhibits filed by the defendant at the registry of deeds bore her genuine signature. Flynn could not find the defendant's name in her log entries of notary transactions and denied ever previously seeing the defendant. Examining three exhibits (instrument of appointment, discharge of mortgage, and discharge and release of judgment), Flynn noted irregularities with attestations and denied that she affixed her signature to the documents.

Discussion. 1. Denial of motion for mistrial. "The decision whether to declare a mistrial is within the discretion of the trial judge." Commonwealth v. Bryant, 447 Mass. 494, 503 (2006). This discretion is so vested because the trial judge "is in a better position than [this court is] to assess the actual impact of particular testimony on the jury." Commonwealth v. Adamides, 37 Mass. App. Ct. 339, 343 (1994). We disagree with the defendant's contention that the judge erred on three occasions to declare a mistrial.

While the trial was replete with references to the civil litigation (and related settlements) that plagued the family for many years, the defendant now claims that the judge should have granted a mistrial when three witnesses suggested "that an arbitrator had already decided [the] [d]efendant's guilt." Counsel first moved for a mistrial when one witness, referring to a 2002 power of attorney, testified that "it was ruled that it was not legitimate." The judge struck the testimony and denied the motion while defense counsel declined a limiting instruction. In an apparent effort to avoid future references to rulings in the civil litigation, the judge instructed a subsequent witness "not to mention the word, arbitration or arbitrator" without authorization from the court. Later in the trial, for the second time, defense counsel moved for a mistrial when a different witness testifying about a settlement agreement

6

could not recall "whether Judge Martin was involved in it or not."  The judge struck the answer and denied a motion for a mistrial primarily because "[n]o one knows who Judge Martin is."  Defense counsel made a third motion for a mistrial when a different witness testified that she "recorded an order from the arbitrator."  Once again, the judge instructed jurors to disregard the testimony and denied the motion.

We discern no abuse of discretion.  To the extent any of this testimony referred to an arbitration decision in the civil case, the references were so vague and fleeting that it is highly unlikely that jurors would make the inferential leap that an arbitrator concluded the defendant forged the documents filed in the registry of deeds.  See Commonwealth v. Baptista, 86 Mass. App. Ct. 28, 32 (2014) (mistrial properly denied where reference to inadmissible evidence vague and fleeting).  Especially given the length of the trial, which spanned approximately one month, the number of witnesses, and the complexity of the evidence presented, it is highly unlikely that these passing references would have influenced the jury in the manner the defendant now claims.  Commonwealth v. Cunneen, 389 Mass. 216, 223-224 (1983) ("vague and fleeting comment, not likely to influence, or even to seize the attention of the jury").  We are also confident that the jurors followed the judge's instructions and disregarded the testimony.  See

Commonwealth v. Williams, 450 Mass. 645, 651 (2008) ("Jurors are presumed to follow judge's instructions, including instructions to disregard certain testimony").  We also note that a reference to arbitration was not as taboo as the defense now claims because at least two exhibits, a codicil and a discharge and release of judgment, referenced arbitration in connection with a civil action.

2.  Denial of request for virtual testimony.  The Sixth Amendment guarantees a defendant's right to call witnesses to testify on his behalf.  See Commonwealth v. Durning, 406 Mass 485, 495 (1990).  "However, the right to call witnesses is not absolute; in the face of 'legitimate demands of the adversarial system,' this right may be tempered according to the discretion of the trial judge" (citation omitted).  Id.  "If a judge exercises his or her discretion to limit the defendant's right to call witnesses, the restriction cannot be arbitrary."  Commonwealth v. Drumgold, 423 Mass. 230, 247 (1996).  Here, the judge did not abuse his discretion in denying the defendant's request to allow a witness to testify via Zoom given the ample opportunity to procure live testimony, the jury's diminished ability to assess the witness's credibility, and the cumulative nature of his proffered testimony.

The defendant made four requests for witnesses to testify via Zoom.  On November 22, 2021, when the matter was scheduled

8

for trial, defense counsel asked whether James McEniry could testify via Zoom. The judge addressed this issue and other issues that had been raised and decided to continue the trial to another date: "And you can let Mr. McEniry know, you can let Mr. Neiman know. I mean there's plenty of time here, so we don't -- I don't want to fiddle around with zooming in from Ireland or -- there's plenty of time there I think to accommodate all of these things if I give you this continuance and we go to April." Months later, on April 22, 2022, the tenth day of trial, defense counsel notified the judge that one witness from Vermont and one from Ireland (James McEniry) wished to testify remotely "[d]ue to travel difficulties." The judge denied the request because he believed it was crucial for jurors to "evaluate the testimony and the demeanor of witnesses." On the twelfth day of trial, defense counsel asked the judge to reconsider "electronic testimony" because McEniry told him earlier in the morning that he had been hospitalized and could not fly. The judge denied the request and once again noted his concern with the ability of jurors to evaluate the credibility of witnesses especially "given the nature of this case." On the fifteenth day of trial, defense counsel announced that McEniry had been released from the hospital and asked once again that testimony be allowed via Zoom. This time, counsel produced some medical records regarding McEniry's dire condition. The judge

examined all the documents and denied the motion after concluding that the defense "had every opportunity" to present this witness but did not do so, and the proffered testimony had "tenuous relevance."

We discern no abuse of discretion given the posture of the case. The defense had ample opportunity to secure the testimony of McEniry. The grand jury returned indictments almost five years before trial in 2017. Continuing the trial date for the fifth time on November 22, 2021, the judge noted that the continuance would provide time to secure the testimony of McEniry. Despite having tools available to preserve the testimony of McEniry, who was seventy-two years old and living in a foreign country, defense counsel waited until the tenth day of trial to spring the Zoom request on the judge. See, e.g., Mass. R. Crim. P. 23, 471 Mass. 1501 (2015) (stipulations of parties); Mass. R. Crim. P. 35, 378 Mass. 906 (1979) (deposition to perpetuate testimony). Given the allegations of widespread fraud in the case and the failure to secure McEniry's testimony in a timely fashion, the judge was well within his discretion in denying the request for Zoom testimony.

We also note that McEniry's expected testimony was largely cumulative of the testimony offered by the defendant's tax expert. Through a rather complicated theory, the defendant attempted to show that his son secretly asked him to take steps

10

to avoid devastating tax liability for his estate.  The defendant expected McEniry would testify in support of this theory by telling jurors that a particular trust was not a "true foreign grantor" trust for tax purposes.  As it turned out, the defendant's tax expert testified to this very fact when he opined that the trust in question was not a legitimate foreign grantor trust because McEniry "was not really a foreign grantor" for tax purposes.  Thus, the defense presented the technical evidence about the trust through the tax expert without exposing McEniry to cross-examination.

3.  Bad act evidence.  The prosecution may not introduce evidence of prior bad acts "for the purposes of showing his bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." Commonwealth v. Helfant, 398 Mass. 214, 224-225 (1986). "Whether evidence is relevant in any particular instance, and whether the probative value of relevant evidence is outweighed by its prejudicial effect, are questions within the sound discretion of the judge" (citation omitted).  Commonwealth v. Smiley, 431 Mass. 477, 484 (2000).  Here, the defendant contends that the judge erred by admitting evidence that (1) the defendant published under his own name life lessons that his son had prepared for his children and (2) during an audit of the

11

defendant's company a forensic accountant observed modifications to certain documents.

Over the defendant's objection, evidence showed that the defendant tried to publish a book containing life lessons that the defendant's son had created for his children.  The judge admitted this evidence because it spoke to the defendant's overall intent in his elaborate scheme to profit from his deceased son.  See Commonwealth v. Gollman, 436 Mass. 111, 114 (2002) ("evidence of the defendant's prior bad acts was admissible as evidence of his intent at the time of the crimes charged").  Thus, there was a "'logical relationship' between the prior bad act and the crime[s] charged" (citation omitted).  Commonwealth v. West, 487 Mass. 794, 805 (2021).  The probative value of this evidence that spoke to the defendant's overall intent outweighed any risk that jurors would convict the defendant merely because he attempted to appropriate his son's ideas.  Accordingly, we conclude there was no error in the admission of this evidence.

Next, attempting to show others had access to the defendant's computer, defense counsel extensively cross-examined a witness about the internal processes of the defendant's business known as Send It Later (SIL) and the hostility of two particular people directed at the defendant.  The defendant then objected to testimony of a forensic accountant who found

modifications to documents during a financial audit of SIL. Overruling the objection, the judge believed this testimony was relevant because the defense raised issues about the potential bias of persons connected with SIL. On appeal, the defendant contends that the accountant's testimony was not relevant. We need not resolve the relevance issue because we do not perceive any prejudice. The accountant's testimony was brief, the audit included documents provided by many people connected with SIL, the modifications were not tied to the defendant in any way, and two other SIL employees (the recent college graduates) testified that the defendant was responsible for making modifications to documents that were at issue in this case.

4. <u>Duplicative convictions</u>. We disagree with the defendant's contention that the two convictions for forging the notary attestations should be dismissed as duplicative of the convictions for forging the signature of the defendant's son. These convictions are not duplicative because the forged notary attestations were not limited to the documents containing forged signatures of the defendant's son. Clocher's forged notary attestation appeared in connection with three other documents, and Flynn's forged notary attestation appeared on two other documents. The verdict slips indicate that the forged notary attestations stand independently from the forged signatures of the defendant's son. Therefore, jurors could have convicted the

13

defendant of distinct and unrelated acts of forging his son's signature as well as forging the notary attestations. Given our conclusion, we need not address the defendant's contention that a forged document consists of a single prosecution unit that is not susceptible to multiple forgery indictments.

5. _False pretense regarding written instrument_. Finally, we disagree with the defendant's contention that the judge should have entered a required finding of not guilty on the indictment that charged obtaining a signature by false pretense. This charge related to Clocher's notary signature affixed to an affidavit. He argues that there was no evidence that the defendant made any representations to Clocher about the affidavit, false or otherwise, and the affidavit was not a written instrument within the meaning of G. L. c. 266, § 31.

Based upon the evidence presented, jurors could reasonably infer that the defendant obtained Clocher's signature on the affidavit through a false pretense. "The statutory elements of this crime consist of (1) obtaining the signature of a person to a written instrument (2) the false making whereof would be a forgery (3) by a false pretense (4) with intent to defraud." _Commonwealth_ v. _Levin_, 11 Mass. App. Ct. 482, 495 (1981). The defendant presented one version of the affidavit to Clocher, obtained his signature, then materially altered the document without Clocher's knowledge. Clocher testified that he would

14

not have signed the affidavit as altered.  Implicit in presenting an affidavit for a signature is that the contents of the affidavit are complete and not subject to change after being signed by the affiant because the signature serves to affirm the averments.  See Commonwealth v. Morrison, 252 Mass. 116, 122-123 (1925) ("misrepresentation as to a person's present intention may be a false pretense" without direct evidence of false statement).  Thus, the evidence was sufficient to submit the question to the jury.

Additionally, the affidavit constituted a "written instrument" under G. L. c. 266, § 31.  While the statute does not define the phrase, we construe words and phrases "according to the common and approved usage of the language."  G. L. c. 4, § 6.  An affidavit may be considered a "written instrument" as that phrase is commonly understood.  See, e.g., Commonwealth v. Aronson, 312 Mass. 347, 350 (1942) ("power of attorney" considered instrument); Commonwealth v. Hutchison, 114 Mass. 325, 326 (1873) ("agreement of copartnership" considered instrument); Levin, 11 Mass. App. Ct. at 488-489, 493, 495 (insurance "application" and "medical examination forms"

considered instruments).  Thus, the judge properly submitted the issue to the jury.

Judgments affirmed.

By the Court (Vuono,
  Englander & Hodgens, JJ.[1]),

*Paul Little*

Clerk

Entered:  January 16, 2025.

---

[1] The panelists are listed in order of seniority.