STATE OF HAWAII, Plaintiff-Appellee, *v.* KENNETH LE VASSEUR, Defendant-Appellant, and STEVEN CHARLES SIPMAN, Defendant

NO. 6930

JUNE 27, 1980

HAYASHI, C.J., PADGETT AND BURNS, JJ.

OPINION OF THE COURT BY PADGETT, J.

Mr. LeVasseur was indicted on June 22, 1977, for having committed the offense of theft in the first degree, HRS § 708-831(1)(b) by removing two Atlantic Bottlenose dolphins (Kea and Puka) from the University of Hawaii marine labora-

tory at Kewalo Basin, Honolulu, Hawaii and placing them in the ocean off the Waianae coast of Oahu. Following a trial by jury, Appellant LeVasseur was convicted and sentenced to five years probation with the special condition that he serve six months in jail. His conviction and sentence are the subject of the instant appeal.

Appellant LeVasseur began working at the University of Hawaii marine laboratory at Kewalo Basin, Honolulu, as an undergraduate research assistant in January, 1975. In May of 1975, he moved into living quarters at the laboratory and continued to reside there until the date of the theft. During the nearly two years he worked at the lab, his duties were primarily concerned with maintenance. He repaired and cleaned the dolphins' tanks, fed them and swam with them. On May 27, 1977, he was informed that he was being discharged and was given 30 days notice to leave the Kewalo facility.

Approximately two hours before sunrise on May 29, 1977, Appellant LeVasseur and four or five other people removed the two dolphins from their tanks at the Kewalo Basin laboratory and transported them by van some fifty miles to Yokohama Bay, on the northwest side of the island of Oahu. The dolphins were taken from the van and released into the ocean about 45 minutes before sunrise. Appellant testified that his intention was to give the dolphins freedom of choice as to whether or not they returned to captivity.

The law with respect to the dominion and ownership of wild animals, called *ferae naturae* in law latin is ancient and well-developed. Cases respecting such matters date back to the very beginnings of the common law. Actions such as appellant took interfering with the rightful possession of such animals are, and always have been "theft." *See, e.g., Gavit, Bernard, Blackstone's Commentaries on the Law*, pp. 454, 850 (1941).

## ADVANCEMENT OF THE CASE

Appellant contends that the advancement of the trial date by the trial court from February 20, 1978 to November 28,

1977 deprived him of his Sixth Amendment right to effective assistance of counsel. We disagree.

On September 13, 1977, the November 28, 1977 trial date was stipulated to by the parties. On November 23, 1977 the November 28, 1977 trial date was advanced until February 20, 1978 because new counsel was substituted for Appellant LeVasseur's co-defendant. One day later (November 24, 1977), the defense was informed by the prosecution of its intent to move to sever the co-defendant's case and return appellant's case to the November 28, 1977 trial date. The state's motion was granted on November 28, 1977. Thus, defense counsel was anticipating a February 20, 1978 trial date for only five days of the nearly three months following appellant's indictment. We are not persuaded that these five days, coming as they did on the very eve of trial, at a time when defense counsel should have been nearing the end of his trial preparation, prejudiced the preparation of appellant's defense.

### VOIR DIRE

Appellant also contends that the trial court abused its discretion by limiting his counsel's voir dire of the jury panel. The regulation of voir dire is a matter within the discretion of the trial judge and will not be disturbed on appeal "absent abuse of [the trial court's] broad discretion, and a showing that the rights of the accused have been substantially prejudiced". *State v. Altergott*, 57 Haw. 492, 499, 559 P.2d 728, 734 (1977).

Appellant's counsel began the voir dire of the original jury panel by directing questions in an apparently random manner from juror to juror. Rather than discussing a series of topics with each individual juror, he skipped back and forth between subjects as he switched his questioning from one juror to the next. After three hours of such questioning, the trial court informed counsel that he would have 15 minutes to complete his voir dire; however, upon his representations that he had not had sufficient opportunity to question the jurors about, *inter alia,* pretrial publicity, the court granted appellant's

counsel an additional one and one-half hours (with directions that he ask all his questions of the jurors one at a time). At the conclusion of the additional time, the court stopped the voir dire of the original jury panel even though appellant's counsel had not gotten around to questioning three of the jurors on the issue of pretrial publicity. Thereafter, the court entertained challenges for cause to the jury as well as peremptory challenges.

Appellant argues that the court's action constituted substantial prejudice. Specifically, he contends that without knowledge of the effect, if any, of pretrial publicity on those three jurors, he could not effectively exercise his peremptory challenges. We note that he did not exercise his third and last peremptory challenge. Our Supreme Court has stated that:

> The amount and nature of pretrial publicity directly determines the lengths to which a trial judge must go on voir dire to assess the possibility of prejudice resulting from that publicity.

*State v. Pokini*, 55 Haw. 640, 642, 526 P.2d 94, 99 (1974). Certainly, the extensive coverage of appellant's case in the media, both in Hawaii and other parts of the world, should have alerted appellant's counsel to the desirability of voir dire of prospective jurors concerning their exposure to such publicity.

If, under *Hawaii Rules of Penal Procedure* 24(a), the trial court had conducted the voir dire in the present case, this court would closely consider the extent to which prospective jurors were questioned about pretrial publicity. *Cf. Pokini, supra*. In the present case, however, defense counsel was permitted to conduct voir dire at great length and sufficient opportunity was provided to question prospective jurors on pretrial publicity and its effects.

Trial counsel did question each of the members of the original jury panel during his initial three hours of voir dire. The fact that after three hours he still had not seen fit to question three of the jurors about pretrial publicity was not a failure for which the trial court was responsible. Yet, thereafter the trial court gave trial counsel an hour and one-half of additional time to complete his questioning of the original jury

panel; but he chose to spend his time asking individual jurors questions on a variety of topics rather than limiting his questions to pretrial publicity. Moreover, the trial court asked the members of the jury panel when they were first seated whether they had been exposed to or affected by pretrial publicity.

The trial court did not abuse its discretion in regulating the voir dire.

### CHOICE OF EVILS

At various times during the trial, appellant attempted to offer evidence of the poor conditions at the laboratory in support of a "choice of evils" defense.

In the beginning, he asserted this defense based on the contention that dolphins were included within the meaning of "another" in HRS § 703-302. Later he added a contention, eventually made explicit, that the United States was "another" being protected under that statute. Under this theory, appellant contended that he chose the lesser of two possible harms when he released the dolphins. Simply put, he contended that he chose to commit the lesser harm of theft in the first degree in order to avoid greater harm either to the dolphins or to the statutorily expressed policy of the United States. The trial court's ruling that the choice of evils defense was not available to the appellant is a central issue in this appeal.

In the State of Hawaii, the choice of evils defense is defined by statute as follows:

§ 703-302. *Choice of evils*. (1) Conduct which the actor believes to be necessary to avoid an imminent harm or evil to himself or to another is justifiable provided that:

(a) The harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and

(b) Neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(c) A legislative purpose to exclude the justification claimed does not otherwise plainly appear.

(2) When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for his conduct, the justification afforded by this section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be suffices to establish culpability.

Appellant contends that because the dolphins were included in a "specific situation" for which "neither the Code nor the law defining the offense [of theft] provides exceptions or defenses", they should be considered within the term "another". This argument must fail because, as the trial court noted, the legislature has provided a specific definition of "another" that does not include dolphins. HRS § 701-118(8) defines "another" as "any other person and includes, where relevant, the United States, this State and any of its political subdivisions, and any other state and any of its political subdivisions." Person is defined as a natural person and when relevant a corporation or an unincorporated association. HRS § 701-118(7). Thus, the statute makes clear that a dolphin is not "another" under HRS § 701-118(8).

Appellant's second argument is that his actions protected the United States (which is "another") by enforcing its policy of protecting dolphins. Specifically, he cites the Marine Mammal Protection Act, 16 U.S.C. § 1361 and the Animal Welfare Act, 7 U.S.C. § 2131, as evidence that cruelty to dolphins is a harm clearly recognized by the United States. While it is unclear whether the Marine Mammal Protection Act represents such a policy with respect to the instant dolphins,[1] it is clear that the provisions of the Animal Welfare Act apply to Kea and Puka since the protection of the Animal Welfare Act extends to all warm-blooded animals. As noted in

---

[1] The Marine Mammal Protection Act was enacted on December 21, 1972; the two dolphins were acquired by the University of Hawaii laboratory in 1969 and June of 1972.

House Report No. 91-1651, 91st Cong., 2nd Sess., the purpose of the bill was to establish "by law, the humane ethic that animals should be accorded the basic creative comforts of adequate housing, ample food and water, reasonable handling, decent sanitation, sufficient ventilation, shelter from extreme of weather and temperature, and adequate veterinary care including the appropriate use of pain-killing drugs." *Reprinted in* [1970] U.S. Code Cong. and Ad. News 5103, 5104. The provisions of the statute and its concomitant regulations establish conditions for the housing,[2] care,[3] and feeding[4] of laboratory animals, including dolphins. Moreover, civil penalties of up to $1,000 a day are provided for research facilities that do not comply with the specified standards.[5] Thus, 7 U.S.C. § 2131 *et seq.* and its accompanying regulations manifest a national policy to protect the well-being of laboratory animals like the instant dolphins.

Appellant testified at length about his familiarity with facilities that could hold the dolphins at least temporarily, for example, the Navy Undersea Laboratory and Sea Life Park; nonetheless, he chose to release the dolphins into the open ocean. Furthermore, appellant testified that he began researching the release of the dolphins a year before the event in question took place; and that the actual decision to release the dolphins was made a month ahead of time. Yet, he offered no explanation as to why he never attempted to contact the federal government either by phone or mail to report the alleged life-threatening conditions at the laboratory. In other words, it is clear that the appellant consciously and deliberately chose "theft" of the dolphins as that crime is defined by our statutes as the alternative to the "evil" of the alleged violation of the policy of the United States for the protection of laboratory animals.

---

[2] 9 CFR § 3.100, 103, 108.

[3] 4 CFR § 3.106, 109.

[4] 9 CFR § 3.104.

[5] 7 U.S.C. § 2149.

Consequently, the trial court was squarely faced, as are we, with the threshold determination of whether, as a matter of law, the harm or evil of the alleged violation of the policy of the United States for the protection of laboratory animals outweighed the evil of the commission of the crime of theft. We agree with the ruling of the court below and hold that appellant's action in removing the dolphins from their tanks, transporting them to Yokohama Bay and there releasing them into the ocean, thereby committing the crime of theft, was at least as great an evil as a matter of law as that sought to be prevented. Accordingly, the trial court correctly ruled that under the instant circumstances, the choice of evils defense was not available.

Appellant complains of the quashing of certain subpoenas and the refusal to allow certain testimony. With one exception, all these rulings involved evidence offered in support of the asserted "choice of evils" defense and are therefore, affirmed.

One, however, evidences a different possible defense, that of a claim of authority under HRS § 708-834(1)(b).

### QUASHING SUBPOENA

Appellant caused the issuance of a subpoena duces tecum directing Dr. Herman, head of the laboratory, to bring with him to court all records regarding the dolphins and any and all procedures, rules and regulations of the University of Hawaii concerning the care and treatment of the dolphins at its laboratory facilities. At the hearing on the motion to quash the subpoena, appellant's counsel stated that on the basis of his client's representations, he believed certain University regulations authorized the release of the dolphins under emergency conditions. Appellant's counsel also stated that he was engaging in a "fishing expedition". The government objected to the request for research data and University of Hawaii's rules regarding the care and treatment of the dolphins as being burdensome and oppressive. The trial court found the subpoena to be "oppressive and unreasonable, especially in

view of its broad scope and its dubious relevancy to the issues at trial''.

Our Supreme Court in *State v. Pacarro*, 61 Haw. 84, 595 P.2d 295 (1979), made clear that a subpoena duces tecum is not be be used as an additional means of discovery or to permit a fishing expedition.

In the present case, appellant's request for all Dr. Herman's research data was clearly overbroad. The request for University regulations was a different matter. Presumably, the regulations regarding laboratory procedures were not so extensive as to preclude their ready productions in a manageable form.

The crucial defect in the request for the laboratory regulations was that appellant provided no basis to indicate that the regulations in fact contained exculpatory information. In other words, the defense merely sought to peruse the regulations to ascertain whether any of them were of an exculpatory nature. As noted in *Pacarro*, such a generalized request is contrary to the purpose of the subpoena duces tecum. If appellant had submitted evidence to the trial court by affidavit or otherwise, indicating that specific regulations of an exculpatory nature existed, his request might well have been granted. But a mere desire to fish for such regulations did not meet the requirements of specificity and particularization required by HRPP 17(b) and *State v. Pacarro*, 61 Haw. 84, 595 P.2d 295. We also note that appellant in his testimony at trial did not indicate the existence of such regulations; nor was Dr. Herman asked about the existence of such regulations on cross-examination when he testified that appellant's act was unauthorized. Moreover, when asked for an offer of proof in support of the claim of justification, appellant's counsel did not allude to such regulations.

Any contention that there existed a regulation allowing appellant to secretly remove the dolphins from Kewalo Basin and turn them loose in the ocean strains credulity; but if such was appellant's contention, he should have made the existence of the regulation clear rather than simply telling the court that he was on a fishing expedition.

## INSTRUCTIONS

We also find appellant's objections to the court's rejection of his jury instructions to be without merit. Defendant's Instruction No. 7 defining property was repetitive in view of the court's instruction to the jury that the dolphins were property. *Sherry v. Asing*, 56 Haw. 135, 531, P.2d 648 (1975). Similarly, Defendant's Instruction No. 23 regarding the definition of "deprive" was covered by the court's instruction to the jury that deprive means to make it unlikely that the owner will recover his property.

Defendant's Instruction No. 4:

"Obtain" means, when used in relation to property, to bring about a transfer of possession or other interest whether to the obtainee or another;

Defendant's Instruction No. 13:

It is a defense to a prosecution for theft that the defendant believed that he was authorized, by the owner or by law, to obtain or exert control as he did;

and Defendant's Instruction No. 14 regarding the choice of evils defense, HRS § 703-302, were not supported by the evidence. *Id*.

## FAIR TRIAL

Appellant also asserts that the numerous "errors" about which he complains on appeal constitute evidence that he was denied his right to an impartial tribunal as guaranteed by the Fourteenth Amendment to the United States Constitution and an Article 1, § 14 of the Hawaii Constitution. In light of our determination that the trial court was not in error, we find appellant's contention to be without merit. In this connection, a careful review of the transcript shows the judge below to have been patient and fair in a situation where appellant's counsel persistently attempted to go into areas already ruled irrelevant. The judge did not depart from scrupulous fairness in the face of obvious provocation.

### SENTENCE

Finally, appellant argues that his sentence was unduly harsh. He was convicted of having committed theft in the first degree, a Class C felony (HRS § 708-831) punishable by a $5,000 fine and a maximum sentence of five years in prison, HRS § 706-640 and 660, respectively, and was sentenced pursuant to HRS § 706-624(3) to five years probation with the special condition that he serve six months in jail.

This court may modify a sentence if, in its opinion, the sentence is excessive and injuriously affects the substantial rights of the appellant. HRS § 641-16. Appellant LeVasseur is a twenty-nine year old college educated adult with no criminal record. While letters submitted to the trial court indicate that a number of well-respected citizens in the community believed that the criminal act for which he was convicted was motivated by a sincere desire to protect the dolphins, the trial court was able to observe his demeanor and conduct as a witness, which we are unable to do. Nothing we see in the transcript of appellant's testimony leads us to believe the trial judge acted erroneously in passing sentence. HRS § 706-621. Contrary to the assertions of appellant, it is apparent from the trial court's decision to grant probation that he benefited from the trial court's consideration of factors enumerated in HRS § 706-621.

The court's decision to impose a six-month jail term for appellant's vigilante action that destroyed costly research, cannot be said to be excessive. However, we point out that under Rule 35, HRPP, it is open to the court below to reduce the sentence within ninety (90) days of the receipt of our mandate if it sees fit.

Affirmed.

*John F. Schweigert* for the defendant-appellant.

*Sandra Alexander* for the plaintiff-appellee (*Arthur E. Ross* on the brief).