900 P.2d 172

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**DeVictor King MASON, also known as Devidor King Mason, Defendant–Appellant.**

**No. 16661.**

Intermediate Court of Appeals of Hawai'i.

June 22, 1995.

Certiorari Denied July 13, 1995.

Jonathan W. Leeds, on the brief, Honolulu, for defendant-appellant.

Charlotte J. Duarte, Deputy Pros. Atty., City and County of Honolulu, on the brief, Honolulu, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

Defendant–Appellant DeVictor King Mason (Defendant) was indicted on June 25, 1987, for committing Forgery in the Second Degree, in violation of Hawai'i Revised Statutes (HRS) § 708–852 (1985), on November 19, 1985. On December 23, 1987, following a jury-waived trial, Defendant was convicted of the charged offense and was scheduled to be sentenced on February 12, 1988. Defendant failed to appear for sentencing, and a bench warrant for his arrest was issued on February 12, 1988. The warrant was executed on May 27, 1992, and Defendant was sentenced on November 5, 1992 to five years' incarceration. The Judgment of conviction was filed on November 5, 1992, and Defendant appealed therefrom. We affirm the Judgment but remand the case for a determination under HRS § 706–671 (1985) of credit for presentence confinement.

## I.

On November 19, 1985, Defendant went to the Lollipop Lounge (the Lounge) in Waikiki. According to Howard Nadler (Nadler), the manager of the Lounge at the time of the alleged offense, Faimafili Milo (Milo), a doorman, brought to him a traveler's check that had been originally signed in Japanese characters and indicated that the person tendering the check (Defendant) "did not look Japanese." Nadler instructed Milo to have Defendant countersign the check, which Defendant did. On direct examination, Nadler testified that he observed Defendant sign the traveler's check. Nadler then called the police. On cross-examination, Nadler admitted telling defense counsel, four days before trial, that he did not see Defendant sign the check. Nadler claimed that his memory was hazy when he first spoke with defense counsel, but once he remembered the check being signed in Japanese characters and then countersigned in "regular English writing," he remembered the case. The State submitted Nadler's statement to the police into evidence as a prior consistent statement. In that statement, Nadler declared that Defendant signed the traveler's check in his and Milo's presence. Nadler identified Defendant in court as the person who countersigned the check and agreed with defense counsel that Defendant's appearance had changed, but he, nevertheless, could positively identify Defendant.

The traveler's check was a "BankAmerica Traveler's Cheque" (the Check) in the amount of twenty United States dollars. The Check stated that "BankAmerica Corporation ... will pay this cheque to the order of [blank] in United States Twenty Dollars." Perpendicular and to the left of that statement, beneath a signature line, were the words, "When countersigned on reverse with this signature[.]" The Check was signed in Japanese characters above these words and countersigned "Yoshi Sakamoto" on the back of the Check.

Officer Wayne Fernandez (Officer Fernandez) testified that when he arrived at the Lounge, Milo and Nadler identified Defendant. Officer Fernandez called dispatch and discovered that a Tomeyo Sato had reported the Check stolen. He confirmed the report with Bank of America.[1] He then arrested Defendant for forgery. During cross-examination, defense counsel had Officer Fernandez read portions of Milo's statement. The

---

1. Officer Wayne Fernandez testified that American Express confirmed that the traveler's check was stolen and later stated that American Express reported the check stolen on November 15. The deputy prosecuting attorney stated, "That should be the Bank of America" to which the officer replied "Or Band [sic] of America."

From the testimony, it is unclear who the reporting agency was, but as the traveler's check was issued by Bank of America, we assume it was Bank of America, and not American Express, that reported the check stolen and confirmed the officer's inquiry.

statement related that Milo was a previous acquaintance but not a friend of Defendant and that Defendant had admitted to having eight traveler's checks totalling $160. Officer Fernandez also testified that Milo stated he saw Defendant sign the Check but did not mention Nadler witnessing the countersignature. Milo's statement appeared to indicate that Milo took the Check to Nadler, Nadler told him to have Defendant sign the Check, Defendant signed the Check, and Milo then went back to Nadler and told Nadler that the name on the Check did not match the name by which Milo knew Defendant. The officer did not find any traveler's checks on Defendant.

Another officer testified that he interviewed Defendant. Defendant told this officer that he first became aware of the Check when Officer Fernandez showed it to him at the Lounge. Defendant knew he would not be able to cash the Check because it was written in "Japanese" and he did not understand or read "Japanese." He did not sign the Check. The officer added that Defendant told him Defendant knew Milo and that Milo suspected Defendant of reporting Milo's wife for welfare fraud.

A court interpreter, qualified as an expert in Japanese language and culture, testified that the Japanese characters on the Check translated into "Sato Tomeyo," Sato being the surname. Tomeyo is a feminine name, and in Japan it is not a common practice for Japanese males to be given feminine names.

At the close of the State's case, Defendant moved for a judgment of acquittal, claiming that the State failed to establish that the "acts [were made] without [the] permission or authority of the rightful owner of the instrument." The motion was denied.

The defense attempted to present testimony that Milo told another person he "had gotten his revenge against [Defendant]." The court refused to allow the testimony, reasoning that it was irrelevant because Milo was not a witness in the case. The defense

argued that Defendant was prejudiced by his inability to confront Milo.

The defense and the State then stipulated two reports into evidence. The first was a fingerprint analysis comparing the latent prints from the Check with Defendant's latent prints. However, the "latent[s] [were] not identifiable." The second, a writing analysis, concluded that Defendant "could neither be identified nor eliminated as a possible writer of the Sakamoto countersignature[.]"

Before resting, Defendant moved to dismiss the case on speedy trial and pre-indictment delay grounds. Defendant claimed to have been prejudiced by his inability to examine Tomeyo Sato and Milo. Both had been listed on the State's witness list but were not present for trial. The court denied the motion as untimely.[2] The defense rested. After closing arguments, the court found Defendant guilty and made the following findings of fact:

The Court finds that [Defendant] falsely completed a Bank of America Traveler's check ... by countersigning the name Jo Chi Sakamoto,[3] in the presence of Mr. Nadler. Defendant is neither Jo Chi Sakamoto, nor Tomeyo Sato, the maker of the check, and the maker had reported the check stolen prior to the incident on November 19th.

The Court finds that [Defendant] had the intent to defraud the owner of the check and that intent is found by a reasonable inference drawn from the circumstances of the signing and offering of the check for cashing. The check was a commercial instrument.

The Court finds Mr. Nadler to be a credible witness.

(Footnote added.)

Prior to his sentencing, Defendant issued subpoenas duces tecum to several government offices. Defendant essentially sought documents to support a claim of additional credit for confinement before sentencing. An order filed September 30, 1992 quashed the subpoenas on the basis that the informa-

---

**2.** On appeal, Defendant does not challenge the trial court's denial of his motion to dismiss on pre-indictment delay and speedy trial grounds.

**3.** The phonetic spelling used in the transcript is an incorrect spelling of the countersignature.

tion sought was irrelevant to sentencing and Hawai'i Rules of Penal Procedure (HRPP) Rule 16 was the proper mechanism for discovery from the State.

## II.

Defendant raises several points on appeal. Taken in logical order, they are that: (1) there was insufficient evidence to establish the Check was stolen; (2) Defendant's confrontation rights were violated by the admission of hearsay statements in evidence; (3) Defendant was denied effective assistance of counsel because his counsel failed to object to the hearsay statements and to ensure Milo's presence at trial; and (4) it was error to quash his subpoenas duces tecum.

## III.

■■■ We examine, first, Defendant's argument that there was insufficient evidence to establish that the Check was stolen. It is well-settled "that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction[.]" *State v. Batson*, 73 Haw. 236, 248, 831 P.2d 924, 931 (1992). On appeal, the test "is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact." *Id.* Substantial evidence is "evidence which a reasonable mind might accept as adequate to support the conclusion

of the factfinder." *State v. Gabrillo*, 10 Haw. App. 448, 459, 877 P.2d 891, 896 (1994) (citation and internal quotations and brackets omitted).

■■■ Defendant was convicted of Forgery in the Second Degree in violation of HRS § 708–852.[4] A person commits this offense "if, with intent to defraud, he [or she] falsely ... completes ... a written instrument ... which is or purports to be, ... if completed, a ... commercial instrument ... which does ... affect a legal right, interest, [or] obligation...." HRS § 708–852(1). "'Falsely complete,' in relation to a written instrument, means to transform, by adding, inserting, or changing matter, an incomplete written instrument into a complete one, without the authority of the ostensible maker or drawer...." HRS § 708–850(5) (1985).

There was ample evidence to convict Defendant even excluding the alleged incompetent evidence cited by Defendant, which we discuss in Part IV.

State's Exhibit 1, the Check, was received in evidence without objection. The Check is a "paper ... containing written or printed matter" and therefore, a written instrument as defined under the forgery statute. HRS § 708–850(1)(a) (1985).[5] On the Check's face, the bank promises to pay twenty dollars to the payee when the Check is countersigned on the reverse side with the drawer's signature, which appears on the front of the Check.

4. The statute provides:
 A person commits the offense of forgery in the second degree if, with intent to defraud, he [or she] falsely makes, completes, or alters a written instrument, or utters a forged instrument, which is or purports to be, or which is calculated to become or to represent if completed, a deed, will, codicil, contract, assignment, commercial instrument, or other instrument which does or may evidence, create, transfer, terminate, or otherwise affect a legal right, interest, obligation, or status.
 Hawai'i Revised Statutes (HRS) § 708–852(1) (1985). The statute was amended in 1988 with the addition of the word "endorses." 1988 Haw. Sess.L.Act 155, § 1 at 264. Under the definition section of the forgery statute, the following definition was also added:
 "Falsely endorse," in relation to a written instrument, means to endorse, without the au-

thority of the ostensible maker or drawer, any part of a written instrument, whether complete or incomplete, so that the written instrument so endorsed falsely appears or purports to be authorized by the ostensible maker or drawer. HRS § 708–850(9) (Supp.1992).

5. The statute provides:
 In this part, unless a different meaning plainly is required:
 (1) "Written instrument" means:
 (a) Any paper, document, or other instrument containing written or printed matter or its equivalent; or
 (b) Any token, coin, stamp, seal, badge, trademark, or other evidence or symbol of value, right, privilege, or identification[.]
 HRS § 708–850(1) (1985).

Nadler confirmed that he saw Defendant countersign the Check, thus satisfying the element that Defendant completed an instrument which is or purports to be, if completed, a commercial instrument which does affect a legal right, interest, or obligation. While the defense apparently attempted to discredit Nadler, the court found him "to be a credible witness." We defer to the court's finding because "[i]t [is] for the trial judge as factfinder in this case to assess the credibility of the witnesses[.]" *State v. Cannon,* 56 Haw. 161, 166, 532 P.2d 391, 396 (1975).

■ Additionally, the court could reasonably infer that Defendant completed the Check "without the authority of the ostensible maker or drawer[.]"[6] HRS § 708–850(5). It is not disputed that the Check required the countersignature of the drawer as stated on the Check itself. The ostensible drawer whose name appears on the face of the Check in Japanese characters was one Tomeyo Sato, a female. On the other hand, Defendant is a male and not Tomeyo Sato or Yoshi Sakamoto, the name in which Nadler testified Defendant countersigned the Check. Sato was not present to testify at trial. However, we hold that in a prosecution for forgery, the element of completing a check without the authority of the ostensible drawer, like any other fact, may be proven by circumstantial evidence. *See State v. Bush,* 58 Haw. 340, 569 P.2d 349 (1977) (circumstantial evidence is entitled to the same weight as direct evidence).

Finally, from these circumstances, the court could also infer, as it did, Defendant's intent to defraud. *State v. Brighter,* 62 Haw. 25, 32, 608 P.2d 855, 860 (1980) (intent may be inferred from the defendant's conduct, as well as from other circumstances surrounding the offense). We hold, therefore, that there was substantial evidence which a reasonable mind might accept as adequate to convict Defendant of Forgery in the Second Degree in violation of HRS § 708–852.

**IV.**

We consider, next, Defendant's argument that the admission of several "hearsay" statements violated his right of confrontation.[7] In the initial category of these statements is testimony admitted in evidence because Defendant's counsel did not object. First, Officer Fernandez recounted that police dispatch and a bank told him that the Check was stolen. Second, Officer Fernandez explained how Nadler and Milo identified Defendant. Third, Nadler testified that Milo told him the person trying to cash the Check "did not look Japanese."

The other category of statements consists of excerpts from Milo's statement which were read into the record during defense counsel's cross-examination of Officer Fernandez.

■ We do not agree that Defendant's first two specifications constituted hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hawaiʻi Rules of Evidence (HRE) Rule 801(3). Officer Fernandez's testimony that dispatch and the bank told him the Check was stolen and that Defendant was identified by Milo and Nadler was not hearsay because it did not go to show the truth of the statement "but to establish the basis for the officer's subsequent actions" in arresting Defendant. *State v. Feliciano,* 2 Haw.App. 633, 637, 638 P.2d 866, 870 (1982) (officer's testimony that wit-

---

**6.** Under the Hawaiʻi Uniform Commercial Code, " '[d]rawer' means a person who signs or is identified in a draft as a person ordering payment[,]" HRS § 490:3–103(3) (Supp.1992), while " '[d]rawee' means a person ordered in a draft to make payment." HRS § 490:3–103(2) (Supp. 1992). HRS § 708–850(5) only requires that the instrument be completed without the authority of the "ostensible maker or drawer." Ostensible means "[r]epresented or appearing as such; seeming[.]" *American Heritage Dictionary* 879 (2d college ed. 1982). Thus, because Tomeyo Sato was the person who was required to sign before payment could be made, she was an "os-

tensible drawer." Bank of America, which was obligated to make payment, would be an ostensible drawee.

**7.** Under article I, section 14 of the Hawaiʻi Constitution, "[t]he right of confrontation affords the accused ... the opportunity to challenge the credibility and veracity of the prosecution's witnesses[.]" *State v. Ortiz,* 74 Haw. 343, 360, 845 P.2d 547, 555, *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993). *See State v. McGriff,* 76 Hawaiʻi 148, 156, 871 P.2d 782, 790 (1994).

ness gave him a license plate number of car linked to the defendant was not hearsay since it went to show why an all-points bulletin was issued on the car). *See State v. Perez*, 64 Haw. 232, 638 P.2d 335 (1981).

■ Defendant, however, argues that the trial court considered the officer's testimony as evidence that the Check was stolen. It is true that the trial court did cite hearsay evidence in its decision when it said that "the maker had reported the [C]heck stolen prior to the incident[.]" Yet, the court also found that, "Defendant is neither Jo Chi Sakamoto nor Tomeyo Sato, the maker of the check...." That finding was based on competent evidence. The fact that the Check was stolen is not a necessary element of forgery. The State was only required to show that the Check was signed "without the authority of the ostensible maker or drawer[.]" HRS § 708-850(5). As we have indicated, there was ample evidence of this outside of any hearsay matters. Under the circumstances, the court's consideration of hearsay testimony concerning the Check's theft was harmless error. HRPP Rule 52(a).

As to Defendant's third specification, Nadler's testimony that Milo indicated Defendant "did not look Japanese" was hearsay, but this was not cited by the court as a basis for its decision.

Similarly, the other category of hearsay statements, which consisted of excerpts from Milo's statement was not relied on by the court.

The court expressly rejected Milo's hearsay statement, declaring, "But in any event, that's hearsay. And if the [c]ourt makes a finding of guilt, it is not going to be based on any hearsay testimony that Mr. Milo said he saw." Consequently, any error concerning Milo's statement, as recounted by Nadler or read into the record by Officer Fernandez, was also harmless. *Id.* Therefore, we hold that Defendant's confrontation rights were not prejudiced.

## V.

### A.

Defendant's ineffective assistance claims rests first on the "hearsay" evidence we have discussed above. He asserts that his counsel's errors deprived him of a meritorious defense because the hearsay evidence removed the "reasonable doubt created by the lack of evidence as to authorization, or lack thereof, by the maker of the check[.]"

■ In assessing claims of ineffective assistance of counsel, "[t]he defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *State v. Aplaca*, 74 Haw. 54, 66–67, 837 P.2d 1298, 1305 (1992).

Initially, we reiterate that Officer Fernandez's testimony about information that the Check was stolen and the identification of Defendant was not hearsay and the failure to object to it on counsel's part was not error.

■ As to Nadler's testimony regarding Milo's reference to Defendant's appearance and Milo's statement itself, we have indicated that the court did not rely on the former and expressly rejected the latter. Thus, these apparent errors did not affect any "potentially meritorious defense." We hold that, in a claim of ineffective assistance of counsel, any assumed errors or omissions of counsel which did not have an impact on the court's decision in a jury-waived trial, did not result in any impairment of Defendant's defense.

### B.

Defendant's last ineffective assistance claim is that his counsel should have determined that Milo would not be available to testify at the trial and should have taken steps to ensure his presence. According to Defendant, Milo's absence at the trial eliminated the "reasonable doubt created by proof that Mr. Milo had a motive to fabricate, and had a bias against [Defendant]."

" 'If counsel does not adequately investigate the underlying facts of a case, including the availability of prospective defense wit-

nesses, counsel's performance cannot fall within the wide range of reasonable professional assistance.'" *Aplaca,* 74 Haw. at 71, 837 P.2d at 1307 (quoting *State v. Templin,* 805 P.2d 182, 188 (Utah 1990)) (internal quotation omitted). Milo, however, was not a "prospective defense witness." Based on the statement read into the record, Milo's statement did not amount to exculpatory evidence; on the contrary, he confirmed that Defendant completed the Check by signing it, and therefore, Milo's statement would inculpate Defendant. As a result, Defendant's counsel had no reason, prior to trial, to require Milo's presence.

▇▇▇▇▇ Nor do we find that Milo's absence substantially impaired a potentially meritorious defense. Whether a defense has potential merit requires an evaluation of its possible effect on the decision maker. *Dan v. State,* 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994). Plainly, as we have pointed out, Milo's absence would not be prejudicial to Defendant because Milo's statement that he saw Defendant sign the Check was not exculpatory. Even if we were to assume that as a result of Milo's testimony the court would not believe Nadler but would believe Milo, that would be of no help to Defendant because proof of Defendant's completion of the document would then be established by Milo's own statement. Finally, if, on the other hand, as Defendant contends, Milo's statement would not be believed because he was biased against Defendant, it would be contradictory and speculative to assume that the trial court would, in that event, then disregard Nadler's testimony that he saw Defendant countersign the Check.

8. On appeal, Defendant cites Hawai'i Administrative Rules § 17–1204–7(10) which provides that "[w]hen an offender absconds from the State to escape prosecution, and subsequently surrenders to authorities and requests a final disposition, credit shall apply from the date the notice of surrender is received by a Hawaii [Hawai'i] prosecutor or court of jurisdiction." It is not clear whether this regulation refers to detainers or not; in any event it is not relevant to the issue of whether the subpoenas, here, were properly quashed.

Also, under the rule, a defendant, theoretically, could receive less credit than required under

We do not find Defendant's syllogism to have any merit. Its possible impact, if any, on the trial court would not benefit Defendant. Having concluded that Defendant failed to raise a potentially meritorious defense, we hold that Defendant was not denied his right to effective assistance of counsel.

## VI.

In connection with the court's quashing of his subpoenas duces tecum, Defendant's essential argument is that the court erred because he was entitled to credit for time served while confined in California.

Defendant served subpoenas on the custodians of records for the Department of the Attorney General of the State of Hawai'i, the Warrant/Extradition Division of the Honolulu Police Department, and the Department of the Prosecuting Attorney. Generally, the subpoenas requested documents concerning an out-of-state detainer or hold on and extradition of Defendant. At the hearing on September 18, 1992 regarding the subpoenas duces tecum, defense counsel contended the documents were needed to show that Defendant "exercised good faith efforts to return to the jurisdiction; that this jurisdiction, on the other hand, did not exercise good faith efforts to get him to return to the jurisdiction." [8] The State's position was that the proper means of obtaining the information was by request through HRPP Rule 16, not a subpoena, and that the information sought was irrelevant. The court granted the State's motion to quash the subpoenas.

▇▇▇▇ In his arguments below and on appeal, Defendant alternatively claims that he was extradited and that he was returned pursuant to a detainer. The two are not

HRS § 706–671(1) (1985). If the defendant had surrendered to authorities and had been taken into custody on the bench warrant, under the statute he or she would have received credit from the date of surrender; under the rule the defendant would receive credit from the date the notice of surrender was received, which could be several days after the defendant was taken into custody. Obviously, the statute and not the administrative rules would control. *See Stop H–3 Ass'n v. State Dep't of Trans.,* 68 Haw. 154, 161, 706 P.2d 446, 451 (1985).

synonymous. *See State v. Brant,* 72 Haw. 230, 813 P.2d 854 (1991). Extradition is governed by the Uniform Criminal Extradition Act, HRS chapter 832 (1985), and applies to "any person charged ... with ... [a] felony[ ] or other crime, who has fled from justice[.]" HRS § 832–2 (1985). On the other hand, detainers are governed by the Agreement on Detainers, HRS chapter 834 (1985). The Agreement on Detainers expressly applies only to *"untried* indictments, information or complaints." HRS § 834–1 (1985) (emphasis added). It is not clear from the record whether the "detainer" was a State request to be notified before Defendant was released from California custody or a detainer pursuant to chapter 834. *See Brant,* 72 Haw. at 231 n. 1, 813 P.2d at 855 n. 1.

As previously stated, Defendant had already been tried when a Hawai'i bench warrant for his arrest was issued. A June 19, 1991 minute order in the record indicates that the prosecutor's office represented to the court that "there [was] no detainer on [Defendant]; that they [were] awaiting a governor's extradition warrant; and that Defendant [was] opposing extradition." It is unlikely, then, that Defendant was on a detainer under chapter 834.

However, the record does not establish whether Defendant was extradited and, if so, incarcerated while awaiting extradition. In his sentencing statement, Defendant contends that he was held for "97 calendar days awaiting extradition to Hawai'i [Hawai'i]." Documents received on June 13, 1991, by the criminal administrative judge, establish that Defendant was incarcerated in California for reasons not clear from the record and that he was seeking action on a "detainer."

 Defendant was sentenced pursuant to HRS chapter 706 (1985 and Supp. 1992), and his credit for time served is governed by HRS § 706–671(1). HRS § 706–671(1) provides:

§ 706–671 **Credit for time of detention prior to sentence; credit for imprisonment under earlier sentence for same crime.** (1) *When a defendant who is sentenced to imprisonment has previously been detained in any State or local correctional or other institution following his arrest for the crime for which sentence is imposed, such period of detention following his arrest shall be deducted from the minimum and maximum terms of such sentence.* The officer having custody of the defendant shall furnish a certificate to the court at the time of sentence, showing the length of such detention of the defendant prior to sentence in any State or local correctional or other institution, and the certificate shall be annexed to the official records of the defendant's commitment.

(Emphasis added.) We think the evident purpose of HRS § 706–671(1) is to credit a defendant for the time he or she is confined prior to sentencing in connection with the defendant's ultimate conviction. Consequently, we hold that under HRS § 706–671(1), a defendant is entitled to credit for time served in confinement while awaiting extradition before or after conviction on the indictment, complaint, or information giving rise to the conviction. Thus, if Defendant was incarcerated in California, or any other state, awaiting extradition for this forgery charge, he would be entitled to credit for the time served. *State v. Mahler,* 128 Ariz. 429, 430, 626 P.2d 593, 594 (1981) (defendant arrested on fugitive warrant, waived extradition); *People v. Hardman,* 653 P.2d 763, 764 (Colo.App.1982); *State v. Brown,* 55 Wash. App. 738, 757, 780 P.2d 880, 890 (1989) (defendants awarded credit for time served awaiting extradition under similar statutes). *See Brant,* 72 Haw. at 231–32, 813 P.2d at 855 (lower court credited time defendant served in custody awaiting extradition, issue was not appealed).

The record does not reflect that Defendant was credited for time served before returning to Hawai'i. The Certificates of Presentence Detention furnished to the sentencing court do not include such credit. At sentencing, defense counsel merely stated, "[D]efendant does not agree to the time served credit[.]" There is no indication in the record of whether or not the State otherwise furnished Defendant with the relevant records. The court made no ruling on the merits of Defendant's claim for confinement served out of state.

■ The issue of whether Defendant should have been awarded credit for any time awaiting extradition to Hawai'i is a question which the sentencing court must determine. While HRS § 706–671(1) does not expressly direct the sentencing court to determine credit for time served, " 'whatever is necessarily or plainly implied in a statute is as much a part of it as that which is expressed.' " *Hawaiian Ocean View Estates v. Yates*, 58 Haw. 53, 58, 564 P.2d 436, 439 (1977) (quoting *Chong Yet You v. Rose*, 23 Haw. 220, 222 (1916)). The statute directs that "[t]he officer having custody of the defendant shall furnish a certificate *to the court* at the time of sentence, showing the length of such detention of the defendant prior to sentence in any State or local correctional or other institution[.]" HRS § 706–671(1) (emphasis added). By requiring that the sentencing court be given the information prior to sentencing, the statute indicates that, at least as to issues of credit for time served arising prior to sentence, it is the sentencing court which must·determine such issues. If, as the State argues, the determination was to be made by an administrative agency after the defendant was sentenced, there would be no need to require that the information be transmitted to the court by the time of sentencing.[9] Therefore, it is the duty of the sentencing court to determine the amount of credit to be awarded the defendant when presented with a claim for uncredited time. *Cf. Brant* (under HRS § 706–671(2) (1985), no entitlement to credit for time served in federal detention for unrelated offenses); *State v. Kami*, 71 Haw. 612, 801 P.2d 1206 (1990) (HRS § 706–671(2) does not provide credit for time served while incarcerated for violation of probation); *State v. Correa*, 69 Haw. 407, 744 P.2d 84 (1987) (under HRS § 706–671(2), no entitlement of credit for time spent in a private rehabilitation facility).

■ Under HRS § 706–671(1), a defendant is entitled to credit for time served,

therefore, Defendant is entitled to present evidence at his sentencing hearing to establish such credit. In order to present such evidence, Defendant must have access to relevant information.[10] *Cf. State v. Quelnan*, 70 Haw. 194, 767 P.2d 243 (1989) (for a probation revocation hearing, the State should have responded to defense counsel's timely request for production of items within the possession or control of the State). We hold, thus, that a defendant claiming uncredited time served in confinement under HRS § 706–671(1) is entitled to prove entitlement to such credit and to subpoena such relevant documents as are necessary in aid thereof. As a result, Defendant should have been permitted to subpoena the relevant documents. We therefore reverse the trial court's order of September 30, 1992 quashing the subpoenas duces tecum.

Although we find that Defendant should be afforded the opportunity to subpoena relevant documents, he may not use the subpoenas duces tecum as a fishing expedition. *See State v. Pacarro*, 61 Haw. 84, 87, 595 P.2d 295, 298 (1979). *See also People ex rel. Martone v. Warden*, 175 A.D.2d 821, 572 N.Y.S.2d 939 (1991) (subpoena seeking extradition documents quashed because the defendant failed to establish the relevancy of the documents sought). The subpoenas should meet HRPP Rule 17 requirements of specificity and particularity. *State v. Le Vasseur*, 1 Haw.App. 19, 28, 613 P.2d 1328, 1334 (1980), *cert. denied*, 449 U.S. 1018, 101 S.Ct. 582, 66 L.Ed.2d 479 (1980).

On appeal, the State does concede that the Certificates of Presentence Detention attached to the Judgment did not include the time served between the date of the originally scheduled sentencing date in September 1992 and the date of the actual sentencing date in November 1992. On remand, the judgment shall be amended to reflect credit

---

9. In some cases, a court's determination of the credit for time served will impact the sentence imposed; if, while in pretrial confinement, the defendant has served the maximum term to be imposed, the defendant will not be committed.

10. Although discovery under Hawai'i Rules of Penal Procedure Rule 16 essentially involves pre-

trial discovery, the supreme court has held that post-trial discovery is appropriate if the State's failure to produce materials to the defendant would constitute a violation of "the inherent principles of justice and fundamental fairness accorded to an accused." *State v. Quelnan*, 70 Haw. 194, 199, 767 P.2d 243, 246 (1989).

for time served by Defendant between the original sentencing date and the actual sentencing date in connection with the forgery conviction.

## VII.

Accordingly, for the foregoing reasons, we affirm Defendant's conviction under the November 5, 1992 Judgment but remand this case for sentencing credit proceedings consistent with this opinion.