## COMMONWEALTH *vs.* RALPH M. O'CONNELL.

No. 00-P-894.

Berkshire. December 11, 2001. - June 7, 2002.

Present: BROWN, LENK, & COWIN, JJ.

Further appellate review granted, 437 Mass. 1106 (2002).

*Larceny. Uttering Forged Instrument. Forgery. Negotiable Instruments,* Forgery. *Intent. Evidence,* Intent.

At the trial of indictments charging larceny over $250, uttering, and forgery, based on the theory that the defendant had forged his father's signature on checks that the defendant made payable to himself, endorsed, and then cashed, the Commonwealth's evidence, although sufficient to prove that the defendant had presented the checks at the banks for payment, that the maker's signature on the checks was not that of the father, and that the banks in question, after investigation, concluded that the checks were not properly payable, did not establish that the defendant, with the specific intent to defraud (i.e., in the absence of authorization to sign another's name as maker), signed another's name to the checks and cashed them. [102-107] BROWN, J., dissenting.

INDICTMENTS found and returned in the Superior Court Department on August 21, 1998.

The cases were tried before *Daniel A. Ford,* J.

*Jon R. Maddox* for the defendant.

*Joseph A. Pieropan,* Assistant District Attorney, for the Commonwealth.

LENK, J. After trial by jury, the defendant was convicted on five counts each of larceny over $250, uttering, and forgery. All fifteen charges were occasioned by the defendant's having cashed five checks made payable to him on accounts owned by his father at two different banks. Otherwise put, he was charged with taking his father's checks, forging his father's signature as maker, presenting the checks for payment at the banks, and, because the banks later reimbursed the father for the amounts they had paid out on those checks, with stealing that money

from the banks. On appeal, the defendant asserts three claims of error: (a) the erroneous admission of certain evidence; (b) prosecutorial misconduct; and (c) the denial of his motion for a required finding of not guilty on each count. Because we agree that the evidence was insufficient to support the convictions, we address only that issue and reverse.

*Evidence.* The Commonwealth proceeded on the theory that the defendant forged his father's signature as maker on five checks totaling $11,000 that the defendant had made payable to himself, endorsed, and then cashed. The defendant's father, Stephen G. O'Connell, though subpoenaed by the Commonwealth, did not testify.

We review the evidence in the light most favorable to the Commonwealth. The Commonwealth's physical evidence consisted of (a) the five canceled checks, payable to and endorsed by "R.M. O'Connell" in four instances and "Ralph O'Connell" in another, with all five checks bearing the maker's signature of "S. O'Connell"[1]; (b) surveillance photographs from the banks showing the defendant tendering the checks for payment[2]; and (c) an authenticated signature of the defendant's father.[3]

Witnesses from the banks described their investigations concerning the five checks and the significance of information printed on the checks and surveillance pictures. An official from the Lee Bank testified to its customary practices when a customer complains that a check is not properly payable, viz., the customer is required to report the matter to the police, the police then notify the bank, and the bank thereafter requires the customer to sign an affidavit certifying that the customer did not sign that physical item. The bank reimburses the customer and

---

[1]Four of the checks were written on the account of the Lenox Village Nominee Trust, held in the Lee Bank. The fifth check was written on the account of Stephen G. O'Connell, held in the City Savings Bank.

[2]There was testimony from bank witnesses that the times and dates on the surveillance photographs corresponded to the times and dates the checks were cashed.

[3]The Commonwealth submitted the signature as a writing of the father, contemporaneously witnessed and notarized, to demonstrate the dissimilarity between it and the signatures on the checks already in evidence. Though the signature hailed from an affidavit of forgery, the document was redacted of all information save the signatures of the father and the notary.

it suffers the loss. This witness testified that the father presented canceled checks to the bank, complained they were not properly payable, completed all necessary paperwork, and the bank — following protocol — then reimbursed the father for the value of the. four disputed checks.[4] The Commonwealth introduced lay opinion evidence that the father's authenticated signature did not match that of the maker of these checks. The Lee Bank official testified that two persons in addition to the father had signatory authority on the Lenox Village Nominee Trust account: Thomas and Stephen O'Connell, the defendant's brothers. The official had examined Thomas's and Stephen's signature cards to compare their respective signatures with those on the checks, and had inquired of their father both whether they could have signed the checks and whether he recognized the signatures of Thomas and Stephen.[5]

An official from the City Savings Bank, where the check written on the account of Stephen G. O'Connell was cashed, testified about his investigation of a complaint made by the father about whether a check was signed by him as maker. After receiving an affidavit signed by the father, the official said he determined where and when the check was cashed and by whom. Unlike the Lee Bank witness, this witness did not testify as to his bank's practices with regard to complaints of checks not properly paid. Furthermore, he did not testify about whether his bank credited the father's account for the amount of the disputed check or whether he (or any other bank official) compared the signature of the check's maker with an authenticated signature of the father.

*Sufficiency of the evidence.* The defendant maintains that the evidence was not sufficient to support his convictions because the Commonwealth failed to offer the father's testimony that he had neither signed nor authorized anyone else (including his son the defendant) to sign the five checks. Notably, there was a time early in the trial when the Commonwealth urged this very

---

[4]Evidence as to the father's having made complaint to the banks as to the checks not being properly payable was admitted, over objection, only to explain why the bank officials acted as they did thereafter and not to prove that the checks were in fact not properly payable.

[5]The circumspect and limited nature of this testimony was dictated by evidentiary considerations.

proposition. In his bid to procure a bench warrant on the first day of trial when the father failed to appear, the prosecutor argued: "[W]ithout [the father's] testimony the Commonwealth's case does not survive a required finding motion. It's a case of uttering and forgery. Mr. O'Connell has to testify 'that's not my signature.' There's no two ways around it, Your Honor."

In reviewing a denial of a motion for required finding of not guilty, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (citation omitted). *Commonwealth* v. *Johnson*, 435 Mass. 113, 118 (2001).

We think it beyond dispute that the Commonwealth's evidence, assuming without deciding that it was all admissible, sufficed to prove that it was the defendant who presented the five checks to the two banks for payment. The circumstantial evidence was also sufficient, even without the father's testimony, to establish that the maker's signature on the five checks was not that of the father, and that the signature of both the defendant and "S. O'Connell" as purported maker of the checks each slant to the left while the father's does not. One of the left-slanting maker signatures was on a check drawn on the City Savings Bank account where the father was apparently the only authorized signatory. The other three left-slanting maker signatures (the fourth check bore a maker signature without pronounced slant) were on checks on the Lenox Village Nominee Trust account where the father and a son of the same name (i.e., both qualify as "S. O'Connell") were both listed at the bank as authorized signatories. No handwriting exemplar of or testimony from S. O'Connell the younger was in evidence and no witness, expert or otherwise, testified that the maker's signature on those checks (or, for that matter, on the fifth check from the City Savings Bank) was the defendant's rather than that of the defendant's brother Stephen. The Commonwealth's evidence that the maker's signature on the five checks was the defendant's was accordingly quite attenuated.

The defendant argues that the father's testimony was necessary not only to prove that the signatures as maker were not his but also to establish that the father had not authorized anyone to

sign the checks as maker on his behalf. An argument could also be made for the need of like testimony from the son of the same name as to the four Lenox Village Nominee Trust checks. The contention in essence is that the Commonwealth failed to prove the lack of authorization in connection with each check.

All three crimes of which the defendant stood accused require a false making and an intent thereby to defraud.[6] None of the three explicitly require that the Commonwealth prove a lack of authorization, unlike forgery statutes in other jurisdictions and in the Model Penal Code, which place the burden squarely on the prosecution.[7] It is nonetheless plain that false making alone does not constitute forgery. Under our statute, it is only when the false making is done with the specific intent to defraud that the crime of forgery is established. Implicit in this is the recognition that an authorized but false making (e.g., an adult child of a competent but disabled elder parent, say with a broken hand, signs the parent's name, with the parent's permission, as maker of a check) is not done with the requisite intent to defraud. See *Commonwealth* v. *Hutchinson*, 1 Mass. 7, 8 (1804) (nearly impossible to establish forgery without testimony from person whose name is allegedly forged); *Commonwealth* v. *Kepper*, 114 Mass. 278, 279-280 (1873) (not improper to ask account holder, "Did you sign that?" and "Did you authorize any one to sign it for you?"). Compare *State* v. *White*, 207 Kan.

---

[6]To make out its case on forgery, the Commonwealth must prove that the defendant falsely made all or part of a document with the intent to defraud. G. L. c. 267, § 1. *Commonwealth* v. *Apalakis*, 396 Mass. 292, 295-296 (1985). The crime of uttering has four elements: "(1) offering as genuine; (2) an instrument; (3) known to be forged; (4) with the intent to defraud." *Commonwealth* v. *Levin*, 11 Mass. App. Ct. 482, 496 (1981). G. L. c. 267, § 5. Larceny over $250 by false pretenses consists of knowingly making a false statement of fact with the intent that the person to whom the statement is made should rely upon it as true, such reliance occurs and, as a result, the person parts with personal property or money worth more than $250. G. L. c. 266, § 30. *Commonwealth* v. *Mills*, 436 Mass. 387, 396-397 (2002).

[7]See Model Penal Code § 224.1 (1980) ("A person is guilty of forgery if . . . the actor: (a) alters any writing of another *without his authority*; or (b) makes . . . any writing so that it purports to be the writing of another *who did not authorize the act*") (emphasis supplied); 18 Pa. Cons. Stat. § 4101 (2001); *State* v. *Mason*, 79 Haw. 175, 180 (Ct. App. 1995); *People* v. *Piening*, 99 A.D.2d 583, 584 (N.Y. 1984); *Lewis* v. *Commonwealth*, 213 Va. 156 (1972). See also *Owen* v. *People*, 118 Colo. 415, 421 (1948), and cases cited.

800, 802 (1971) (State must demonstrate signature of purported drawer was false or unauthorized).

Here, the crimes charged all rest upon whether the defendant, with the intent to defraud, signed his father's name to the checks and cashed them. Had the father authorized the defendant to sign his name as maker (or had the brother of the same name as the father either signed himself or authorized the defendant to sign four of the checks), the defendant would have done nothing for which criminal liability would attach under the relevant statutes.

We think the defendant's insistence that the Commonwealth cannot prove its case without the father's testimony, however, goes somewhat too far. An absence of authority, evidencing an intent to defraud, like any other fact, may be proven by circumstantial evidence, see *State* v. *Mason,* 79 Haw. 175, 180 (1995); *State* v. *White, supra,* and direct testimony from the person whose name is allegedly forged is not essential to sustain a conviction. To be sure, while the absence of such testimony need not foreclose a conviction, it may well make it more difficult to obtain.[8] As has been observed, it is an "impossibility, ordinarily, of proving the forgery without [the forgery victim's] testimony." *Commonwealth* v. *Hutchinson,* 1 Mass. at 8. Where the alleged forger and an authorized signatory are kin, the task is rendered more difficult still.

The Commonwealth contends that the Lee Bank's decision to reimburse the father fully for amounts paid on the Lenox Village Nominee Trust checks — a decision made after its customer made complaint, the police were notified, and the bank made investigation into whether an authorized signatory signed the checks as maker — is sufficient to establish that the checks

---

[8]As one court noted, the enhanced difficulty finds its source in the presumption of innocence that remains in effect where the defendant signs the name of another. "Where one signs the name of another to a check, it is presumed, in the absence of other evidence, that he has authority to do so." *Lewis* v. *Commonwealth,* 213 Va. at 157. Were we to assume the existence of such a presumption, the question would be whether it was rebutted here by the father's complaint to the bank to the effect that the checks were not properly payable. The hearsay evidence as to the father's complaint was, however, admitted only for the nonhearsay purpose of explaining the bank's subsequent conduct and not for substantive purposes. It accordingly does not do the job.

were neither signed nor authorized by either of the two S. O'Connells, especially where the bank and the father had discussion as to other signatures. In essence, the Commonwealth attempts to equate the quantum of evidence necessary to satisfy a bank that it should reimburse a customer with that necessary to sustain criminal convictions of forgery, uttering, and larceny. The equation fails.[9]

That a bank followed its customary procedures for dealing with customer complaints concerning checks reported as not properly payable — procedures undoubtedly put in place for sound business reasons — establishes no more than that the bank was satisfied for its own purposes that the checks were not properly payable. The bank's customary practices and actions following investigation of O'Connell the elder's complaints may well have been dictated by purposes (such as customer retention)[10] that are foreign to the criminal law and, in any event, are essentially only the bank's opinions as to what had occurred. These opinions, in turn, had as part of their basis the inadmissible hearsay statements made by the father to bank employees.[11] See *Commonwealth* v. *Kirk*, 39 Mass. App. Ct. 225, 229-232 (1995).[12] The bank formed the view that the customer's son (the defendant), rather than the customer himself,

---

[9]The Commonwealth produced no evidence about the general practices of the City Savings Bank, where only one check was cashed. There was also no evidence whether this bank credited the father for the amount of the disputed check.

[10]The elder O'Connell is a trustee of the City Savings Bank.

[11]The bank's opinion as to what transpired rests on hearsay insofar as it depends on statements made to it by the father concerning his views as to the affixer of the maker signatures. It also rests on hearsay to the extent that it impliedly incorporates any communication that the father had with other authorized signatories about whether they had signed or authorized the checks.

[12]While we need not reach all the defendant's claims of error in the admission of evidence, we observe that the evidence as to the bank's customary business practices, upon which the Commonwealth so heavily relies, is of very questionable admissibility. It is the Commonwealth's position that, because the bank generally does not reimburse complaining customers absent their attestation in affidavit form that a check was not properly payable, the fact that the bank did reimburse the father after he signed a document is a sufficient basis from which the jury could infer that the father had not authorized the subject checks. The Commonwealth fails to acknowledge, however, that the bank's implementation of its customary business practice in any particular situation requires it to rely upon certain explicit representations by that

had been dishonest and it then acted accordingly. That opinion does not constitute the requisite proof beyond a reasonable doubt that the checks were in fact neither signed nor authorized by the defendant's father or brother at the time they were tendered.[13] Cf. *Commonwealth* v. *Fisher*, 433 Mass. 340, 356 n.19 (2001) (improper lay opinion on ultimate issue).

Quite apart from the sufficiency of the evidence as to whether the signatures as maker of the checks were the defendant's, we conclude that the evidence was not sufficient to prove beyond a reasonable doubt that the signatures were unauthorized and that the defendant thereby acted with the intent to defraud.[14] The convictions cannot stand.

*Judgments reversed.*

BROWN, J. (dissenting). Let me state at the outset that too

particular customer. In the situation involving the father, the bank relied upon his explicit representations, which were themselves inadmissible at trial. The evidence, then, of the actions taken by the bank following the father's complaint and signature of a document implicate hearsay because of necessity they lead by direct inference to statements made by the father. See *Commonwealth* v. *Kirk*, 39 Mass. App. Ct. at 229-232.

[13]The dissent concludes that the father's failure to testify, when combined with evidence as to the one check drawn on the account on which the father was sole authorized signatory, permit the jury to infer that the maker signatures were unauthorized. In attributing the father's failure to testify to his being "conflicted" because he "knew" that the maker signatures were not those of his sons Thomas and Stephen, the dissent assumes the very thing at issue. Sidebar discussions revealed that the father was seventy-five years old at the time of trial, had a heart condition, and was summonsed at 6:00 A.M. to appear in court that day during a snowstorm. The dissent acknowledges that the father's absence is not evidence but points to the "limited testimony" of the bank investigator who had interviewed the father. The salient point again, however, is the absence of testimony — the witness was permitted to compare the father's signatures on the affidavit with the maker signatures on the checks but not to testify as to the sons' signatures or as to the father's opinion concerning their signatures.

[14]The Commonwealth has not called to our attention any Massachusetts appellate opinion where the prosecution prevailed without testimony from the complainant that the checks were unauthorized. Moreover, instances we have found where there was reliance upon circumstantial evidence have involved significantly more evidence than here. See *Joseph* v. *United States*, 239 F.2d 524, 527 (5th Cir. 1957) ("while it certainly would have been a wiser course to elicit from the payee by precise questioning the fact that she did not authorize the defendant or any one else to sign her name as payee, it is mere

much significance is placed on the father's absence. As the defendant does not make any substantive claim that the father (or brother) authorized the checks,[1] the father's absence is, in my view, irrelevant.

In any event, I think that here, as often is the case, circumstantial evidence is sufficient to establish such lack of authorization so as to prove guilt beyond a reasonable doubt. See *Commonwealth* v. *Brooks*, 422 Mass. 574, 577 (1996).

The defendant presented the five checks to the two banks for payment. I think the Commonwealth has produced the requisite proof beyond a reasonable doubt that the checks were in fact neither signed nor authorized by the defendant's father or brother at the time they were tendered. The father's failure to appear at trial suggests that he was conflicted; that is, he knew that the signatures on the checks were not those of his other

quibbling, on this record, including the confession of the defendant and the testimony of the prosecuting witness, that . . . she made a trip from El Paso, Texas, to Houston, Texas, to inquire into the matter, to claim that it was not established beyond any reasonable doubt that she did not give the defendant or any one else the authority to sign her name"); *Avila* v. *People*, 163 Colo. 525 (1967) (defendant endorsed a check made payable to another by signing the name of the payee and defendant represented himself to be the payee and gave an address which was nonexistent as his place of residence); *State* v. *Mason*, 79 Haw. at 180 (where defendant was a male who did not share name of female drawer of check or countersignatory, evidence sufficient to establish lack of authorization); *State* v. *White*, 207 Kan. at 802 (where defendant did not know complainant, it can scarcely be stated that use of complainant's name was authorized); *State* v. *Abel*, 241 Or. 465 (1965) (where wife lost checkbook of account held jointly with husband, defendant later purchased the checkbook and wrote checks on the account, identifying himself as the husband, evidence sufficient to warrant inference that defendant acted without authorization). Cf. *Commonwealth* v. *Goldsmith*, 249 Mass. 159 (1924) (evidence sufficient to support conviction of uttering a forged stock certificate where evidence showed stock not transferred from mother to defendant son during her lifetime, defendant admitted to signing mother's name in 1910 and signing his own as witness in 1917, then sold the stock as his own in 1917 and expert testified that signature reflected apparent attempt to make it appear that it was written by a woman); *Almond* v. *State*, 151 Ga. App. 382 (1979) (in prosecution for unlawful attempt to acquire drug by forgery, circumstantial evidence was sufficient to show that defendant knew the prescription was a forgery where handwriting expert testified that defendant probably wrote the prescription herself, and prosecution established, inter alia, that doctor who purportedly signed prescription did not).

[1]If such an argument had been made, I suggest that a missing witness instruction would be appropriate.

two sons, Thomas and Stephen, and did not want to be forced to testify against his remaining son, the defendant.[2] I think a fact finder reasonably could draw inferences, albeit not overly strong, that the signatures were not authorized. In addition, there was evidence as to one of the five checks supporting an inference that the defendant had signed the check. That to me is sufficient. I do not believe that it is such an unreasonable leap to conclude that the defendant had signed the other four as well. See *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980) ("inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable").

Also, I am distressed that the majority opinion may be read, its assertion to the contrary notwithstanding, as a per se rule requiring direct evidence of lack of authorization in future uttering cases. The majority's opinion is not tied in any way to the family relationship between putative maker and the accused here.

One final thought: As to the father's attendance at trial, the question inescapably arises as to why the prosecutor did not obtain a subpoena pretrial and make sure it was served.

---

[2] I fully recognize that the absence of the father from the trial is not evidence that could be used in the required finding equation. I would note, however, that there was limited testimony that a bank investigator had interviewed the father as to whether the signatures could have been those of either of his other sons, but she was apparently not permitted to testify as to the father's opinion.